WESTINGHOUSE ELECTRIC & MFG. CO. v. TOLEDO, P. C. & L. RY. CO.

(Circuit Court of Appeals, Sixth Circuit. July 29, 1909.)

No. 1,868.

1. PATENTS (§ 157*)—CONSTRUCTION—PAPER PATENTS.

While the fact that the device of a patent has never been put in use does not affect the validity of the patent, it is ground for giving it a strict construction.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 157.*]

2. PATENTS (§ 112*)—VALIDITY—PRESUMPTION FROM ISSUANCE.

The presumption of the validity of a patent arising from its issuance is weakened by the fact that certain prior patents, claimed to anticipate, were not cited to nor considered by the examiner.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 164; Dec. Dig. § 112.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**3. PATENTS (§ 328\*)—ANTICIPATION—ELECTRIC CONTROLLER.**

The Brown patent, No. 618,163, claim 6, for a method of electrical control, designed to secure an acceleration of speed of motors and at the same time protect them from injury, is void for anticipation by the Potter patent, No. 524,396.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.\*]

Appeal from the Circuit Court of the United States for the Northern District of Ohio.

L. F. H. Betts, for appellant.

Thomas F. Sheridan and Clifton V. Edwards, for appellee.

Before LURTON and SEVERENS, Circuit Judges, and COCHRAN, District Judge.

COCHRAN, District Judge. This is an appeal from a decree dismissing the bill in a suit for patent infringement. The patent is No. 618,163, issued January 24, 1899, to W. M. Brown, assignor, and assigned to appellant, complainant below, May 27, 1902. The patent is entitled as one for "electric motor control." More definitely, it is one for a method of electric motor control and for an apparatus to practice such method. It contains twelve claims. The first six relate to the method, and the other six to the apparatus. Claim 6, the last of the method claims, is the only one put in suit. It is what is called a "paper patent," in that it has never been used by the appellant, and that though it is in the business of selling electrical controllers. The excuse given for not using it heretofore is that its use would require a motor adapted thereto, and up to this time it has not deemed it best to put such a motor on the market. The validity of the patent, however, is not affected by its nonuser. Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U. S. 405, 28 Sup. Ct. 748, 52 L. Ed. 1122. But it may be said to have a bearing on its construction. In view thereof the patent should not be given a broad or liberal construction. Judge Putnam, in the case of Bradford v. Belknap Motor Co. (C. C.) 105 Fed. 63, with reference to such a patent, said:

"We must proceed with great caution and avoid giving the complainant the benefit of anything beyond what his invention and patent clearly require."

The grounds on which the lower court dismissed the bill are thus set forth in the conclusion of Judge Tayler's opinion:

"So I come to the conclusion:

"1. That all that is important or useful in the patent in suit has been long before discovered and used.

"2. The departure in the patent in suit from preceding forms is so slight and its absence of advance in real usefulness so apparent that we can readily understand why it has never gone into practical use.

"3. Whatever improvement Brown made, it was an improvement obvious to any one skilled in the art and so slight as to be of negligible value."

We do not understand from this that it was thought that the patent is not, to a certain extent, at least, an advance on the prior art. It seems to be conceded that it is; the position being that the advance is so slight as to be of no real value, and, such as it is, is obvious to one skilled in the art. The appellee's contention, however, is that it is not to any extent an advance thereon, having been fully anticipated by

disclosures made in prior patents. The patents relied on are: No. 435,958, issued September 9, 1890, to M. J. Wightman, assignor; No. 444,900, issued January 20, 1891 to M. J. Wightman, assignor; No. 524,396, issued August 14, 1894, to W. B. Potter, assignor; and No. 587,442, issued August 31, 1897, to W. H. Knight and W. B. Potter.

The application for the Knight and Potter patent antedates the Potter patent. The first Wightman and the Knight and Potter patents are each for a method of electric motor control. The second Wightman and the Potter patents are each for an apparatus to practice a method of such control. Each of these, as a matter of course, discloses the method which it is adapted to practice.

It will help us to determine whether claim 6, the one in suit, was so anticipated to understand, to a certain extent at least, the nature of the methods covered by the first five claims, and it will clear up the situation if we address ourselves to certain preliminary matters before proceeding to a consideration of said claims.

Those methods are applicable only where a plurality of electric motors are in use, and that where the field of each motor is provided with duplicate windings. In the specification they are treated as applicable where two such motors are in use, and to them when used in operating a street railway car. In disposing of this case we will so limit ourselves.

An electric motor consists of two parts, one stationary and the other rotary. The former is called the "field," and the latter the "armature." The latter lies within the former. Each itself consists of two subordinate parts, a soft iron core and an insulated copper wire wound around the core. What we mean when we say that the field of each of the two motors has duplicate windings is that it has two coils of such wire wound around its core. The armature and the field winding of each motor are in series, i. e., in continuous relation. Their function is to conduct the electric current coming to them from the trolley wire around their respective cores, from whence it passes to the ground. In passing around the cores the current magnetizes them, and it is the magnetic action so induced that causes the armatures and, sequentially, the axles of the car wheels to which they are attached and those wheels to rotate and the car to move.

The control of the two electric motors is effected by controlling the electric current which flows through them. The apparatus by which it is controlled is termed the "controller," or "switch." It is the cylindrically shaped structure or drum stationed on the car platform on top of which is a crank with a handle whereby the motorman operates it. Such control is exercised to effect several separate and distinct ends, each of which is essential to the successful running of the car. They are as follows, to wit: Starting the car, stopping it, accelerating or lowering its speed, reversing its direction, and preventing the motors being burnt out in the course of effecting the other ends. Conceivably an invention relating to a method of control of two motors so used may be so broad as to cover all the ends for which it may be exercised or it may be limited to some one of them. Here each of the first five of the method claims is limited to a single end, to wit, accelerating the speed of the car. Claim 6 has to do with so

accelerating and at the same time preventing the motors being burnt out.

In dealing with the first five of the method claims we will consider them together. The patent in suit discloses two separate and distinct methods of accelerating the speed of rotation of the armatures of the two motors. One is by varying the circuit relations of the field windings, i. e., the course of the current therethrough, in such a way as to reduce in successive steps the opposition to its flow until the minimum of possible opposition is reached, and doing this first with one motor and then with the other. By so doing, as the opposition is reduced, the flow of the current through the motors is increased and the speed of rotation accelerated in successive steps.

There are two kinds of possible opposition to such flow. One is termed "ohmic resistance," and the other "counter-electro-motive force." The former is the opposition of the wire through which the current flows, and varies with the size and length thereof. It is passive or dead and is analogous to that which friction gives to the flow of· water through a pipe. The latter is active or live and is analogous to that which the load on a water motor causes the vanes or blades thereof to present to the flow of water therethrough. It is generated by the armatures of the motors and is dependent on two factors, the speed of rotation of the armatures and the strength of magnetic action of the fields. This strength is itself dependent on two factors, the quantity—amperes—of current flowing around the cores, and the number of times it flows around them; the product of the two being termed "ampere-turns." The force so generated is like that of the current itself, except that it acts in the opposite direction, and hence its name "counter-electro-motive force." Certain differences between these two kinds of opposition need to be emphasized. Opposition from such resistance exists whether the armatures are rotating or not; whereas, that from such force can exist only when they are rotating. Again, opposition from such resistance can exist as well outside as within the motors; whereas, that from such force exists only within the motors. And, further, opposition from such resistance consumes a portion of the current by turning it into heat, thereby wasting such portion thereof; whereas, opposition from such force does not waste any portion of the current, and it is the overcoming thereof by the magnetic force induced by the current that causes the armatures to rotate and the work to be done.

There are three possible variations of the circuit relations of the duplicate windings of a motor, i. e., of the course of the current therethrough. They may be in series, i. e., so related that the current flows through one and then through the other. They may be in parallel or multiple arc, i. e., so related that the current divides between them and the two portions thereof flow therethrough simultaneously. Or they may be out of relation, so that the current does not flow therethrough either successively or simultaneously, but only through one of them. This being out of relation may be either entire or partial, caused when partial by a shunt—a path of low resistance around one of the windings—in which case a slight portion of the current flows through the shunted winding. These three possible variations of the

circuit relations of the windings yield three grades of opposition from ohmic resistance, one to each variation. The maximum grade is when the windings are in series. The next highest grade is when they are out of relation. It is one-half of the maximum grade. The minimum grade is when they are in parallel. It is one-half of the intermediate grade and one-fourth of the maximum. They yield only two grades of opposition from counter-electro-motive force; two of them yielding the same grade of opposition from this source. The maximum grade is, as in the case of the maximum grade from ohmic resistance, when the windings are in series. The minimum grade is when they are out of relation or in parallel, and the existence of each grade of opposition from this source depends, as heretofore stated, on the fact that the armatures of the motors are rotating. Out of these three possible variations of the circuit relations of the duplicate windings of a motor there comes therefore·three grades of opposition to the flow of current therethrough.

As a consequence of this, these three possible variations of these relations yield also three rates of speed of rotation of the armature of a motor: the minimum rate existing when the maximum grade of opposition exists, i. e., when the windings are in series, the next when the intermediate grade of opposition exists, i. e., when the windings are out of relation, and the maximum when the minimum grade of opposition exists, i. e., when the windings are in parallel. And, if the opposition to the flow of the current is reduced first in one motor and then in the other, in the order of the grades thereof, the maximum opposition existing in both motors when the reduction begins, four distinct grades of opposition from that then existing are yielded, and the speed of rotation is accelerated in four successive steps from the rate then existing, assuming the armatures of the motors to be then rotating.

The other method of accelerating the speed of such rotation disclosed by the patent is by varying the circuit relations of the motors as a whole, and not simply of the duplicate windings thereof. There are three possible variations thereof, the same as in the case of the duplicate windings. They may be in series—out of relation—or in parallel. As the first and last are the only ones used in accelerating the speed, no further reference need be made here to the second one. When the two motors are in series, the current flows through them successively, i. e., first through one and·then through the other. When in parallel, it divides between them, and the two portions thereof flow therethrough simultaneously. The lowest rate of speed exists when the two motors are in series, and that existing when they are in parallel may be said to be double what it is when they are in series, assuming the motors to be able to hold up under this condition. This is so because when the motors are in series the force or voltage of the current is divided between them; whereas, when they are in parallel each motor has the full force or voltage.

The method of acceleration covered by each of the first five method claims of the patent in suit is a combination of these two distinct methods of acceleration, and the only difference between the claims is in their phraseology. The way in which the patentee combined them

is shown diagrammatically in Fig. 2 accompanying the specification of the patent. It is as follows, to wit:

Fig. 2.

In explaining this diagram we would, for the present, ignore so much thereof as is under the letters B and R. That portion thereof has nothing to do with what is covered by the claims of the patent. A represents the armature of one motor, and Fa and Fb the two windings of the field of that motor. AA represents the armature of the other motor, and FFa and FFb the two windings of its field. 1 represents the position at starting, and 2, 3, 4, 5, 6, 7, 8, and 9 represent eight different running positions. 2a represents a transition position

between running positions 2 and 3; 3a a like position between running positions 3 and 4; 5a, 5b, 5c, 5d, four transition positions between running positions 5 and 6; 6a a transition position between running positions 6 and 7; and 7a a like position between running positions 7 and 8. It will be noted that at starting position 1, the windings of each motor are in series, presenting the highest grade of opposition to the flow of current from ohmic resistance, that from counter-electro-motive force not existing, as the armatures are not then rotating. At position 2 the same opposition is maintained; the armatures now rotating. At position 2a the field windings of the left-hand motor are out of relation, and the current flows through but one of them, presenting the next lowest grade of opposition of both kinds in that motor. At position 3 the field windings of that motor are in parallel, presenting the lowest grade of opposition at all possible in that motor; that from ohmic resistance alone being thereby lowered. At positions 3a and 4 exactly the same course as in positions 2a and 3 is followed with the right-hand motor. Thus it is that at positions 4 and 5 opposition to the flow of the current when the two motors are in series is reduced to its lowest grade, and the armatures thereof are rotating at their highest rate of speed with the motors in that relation. In reaching this rate of speed, including it, we have four distinct rates of speed.

Positions 5a, 5b, 5c, 5d, and 6 restore exactly the same amount of opposition that existed at starting position 1. This is so because position 6 finds the field windings of each motor in series. There is this significant difference, however, between the two positions. At position 1 the two motors were in series; whereas, in position 6 they are in parallel, having become so in that position. Up to position 6 the first method of acceleration heretofore described has been in use. At position 6 the other method is called in, and by the change the rate of speed due to the parallel relation with the opposition within the motors at its highest is attained. A detailed consideration of these five positions is not in order here. They are covered by claim 6, the claim in suit, and will be considered fully when we reach that claim. Inasmuch, then, as when the two motors come into such relation the opposition within them is at its highest, just as at starting from rest when they were in series, the speed is capable of further acceleration by calling in the first method of acceleration which was then in use, i. e., by reducing the opposition by successive steps to its lowest grade, first in one motor and then in the other; and this is what is done in the remaining positions. At position 6a the field windings of the left-hand motor are out of relation so that the current flows through but one of them, thus presenting the next lowest grade of opposition of both kinds in that motor to that existing in position 6. At position 7 the field windings of that motor are in parallel, presenting the lowest grade of opposition; that from ohmic resistance alone being thereby lowered, and the lowest grade of opposition at all possible in that motor. At position 7a and 8 exactly the same course as in position 6a and 7 is followed with the right-hand motor, and at position 8 the highest rate of speed possible is attained. Position 9 is exactly the same as position 8—just as position 5 is the same as position 4. The signifi-

cance of this will appear when we take up that portion of the diagram which we have been ignoring, which we will shortly do.

In reaching the rate of speed at positions 8 and 9 we have five distinct rates of speed, including it, from that existing at position 5, thus making nine in all, so far as this portion of the diagram is concerned.

This detailed explanation of the diagram shows that the method of acceleration covered by the patent is a combination of the two methods of acceleration pointed out and how it combines them.

But, before passing to claim 6, a word or two should be said as to that portion of the diagram which thus far we have ignored. Though, as stated, it has no relation to anything covered by the claims of the patent, an understanding of it will shed light on our path. We have noted that one of the differences between opposition from ohmic resistance and that from counter-electro-motive force is that the former can exist outside of the motors; whereas, the latter cannot. It is possible therefore to provide in the car circuit between the controller and the motors a winding of wire, which, if in circuit, will be the source of opposition from ohmic resistance, exactly as the field windings thereof are; and, if provided, cutting same out of circuit, and thereby reducing the opposition arising therefrom, will accelerate the speed of the car, just as reducing the opposition from internal ohmic resistance will do so. What the ignored portion of the diagram covers is two such windings. They are in the car circuit between the active part of the controller and the motors. One of them is the winding of what is termed the blow-out magnet, designated by the letter B. It is within the drum of the controller. It is around a soft iron core, which the current in passing through the winding magnetizes. Its function is to prevent formation of arcs when the contacts of the controller are broken in the course of operation. Though such is its function, cutting it out of circuit, and thereby removing such opposition as it affords, will accelerate, to a certain extent at least, the speed of rotation of the armatures of the two motors. It is claimed that the opposition which it affords is negligible; but the diagram evidences that the patentee thought it afforded enough opposition to make its cutting out of circuit cause an appreciable acceleration in speed of rotation, for he cuts it out twice, and there is no explanation for his doing so except to accelerate such speed. This he does at positions 5 and 9, and this is the only particular in which those positions differ from the immediately preceding positions, to wit, 4 and 8. At position 4 the highest rate of speed with the motors in series has been attained, leaving out of consideration this winding, and by cutting it out in position 5 a still higher rate of speed in that relation is attained. At position 8, without reference thereto, the highest rate of speed with the motors in parallel has been attained, and the cutting it out in position 9 yields a still higher rate of speed in the parallel relation—the highest rate of speed that is possible for the armatures to attain under any conditions. Inasmuch as positions 5 and 9 are likely to be positions of continuous running, during which the controller connections are not broken and the magnet is not needed to blow out arcs, there is no reason why it should not be cut out of circuit and thus accelerate the speed.

The other winding referred to is termed the "rheostat" or "external resistance." and is designated by the letter R.   It is generally placed under the car body, and may consist of an assemblage of plates instead of a coil or coils of wire.   In the diagram it is shown in but one position, and that is position 1, the starting position, when the current is turned into the car circuit and the armatures begin to rotate.   In position 2 it is cut out and remains out thereafter.   This is the only particular in which position 2 differs from position 1.   The effect of cutting it out is to reduce that much opposition to the flow of the current and to accelerate the speed of rotation over what it was in position 1, just as the cutting out of the winding of the blow-out magnet in positions 5 and 9 did likewise.   We have thus three additional rates of speed by so cutting out these two windings, as stated, or twelve in all, in an ascending scale from the lowest to the highest.

This brings us to claim 6, the one in suit.   The method covered by it, as heretofore stated, is one for accelerating the speed of rotation of the armatures and at the same time for preventing their being burnt out in the process of acceleration.   It is in these words:

"The method of shifting two motors from series to parallel relation, consisting of strengthening the field and ohmic resistance of one motor, then placing a shunt around the other motor, and then placing said shunted motor with its field strength and ohmic resistance increased in parallel with the first mentioned motor."

Its nature, as also heretofore stated, is disclosed by so much of positions 5a, 5b, 5c, 5d, and 6, i. e., the transition positions 5a, 5b, 5c, and 5d and the running position 6 of the diagram as are not under the letters B and R.   It consists, according to the claim, of three separate and distinct steps, to be taken successively.

The first one is "strengthening the field and ohmic resistance of one motor."   Strengthening the field, as we have seen, increases the counter-electro-motive force.   By this step, then, both forms of opposition within the motor are brought into play.   The manner, however, of so doing, i. e., of increasing the strength of field and ohmic resistance, or the extent of so doing is not stated, as the language is general and indefinite; but the diagram and explanation thereof in the specification discloses a way of so doing, and that to the maximum, so that this step yields in the motor its maximum grade of opposition to the current. It is shown in positions 5a and 5b.   In position 5a the field circuit of the left-hand motor is changed from what it is in position 5.   There the two windings were in parallel.   The change in position 5a is to out of relation entirely.   The effect of this is to double the ohmic resistance of that motor; the strength of the field remaining as before. In position 5b the field circuit thereof is again changed.   The windings are put in series.   The effect of this is to again double the ohmic resistance and at the same time the strength of the field.   It is thus seen that by this step, taken in this way, the field windings of this motor are shifted back from parallel to series, and that in exactly the same way in which they had theretofore been shifted from series to parallel.

The second step is "placing a shunt around the other motor," thereby putting the two motors out of relation almost entirely.   This is shown by position 5c.

The third and last step is "placing said shunted motor with its field strength and ohmic resistance increased in parallel with the first-mentioned motor." By this step the two motors are changed from out of relation almost entirely to parallel relation, and simultaneously therewith the field strength and ohmic resistance of the other or shunted motor is increased and both forms of opposition within it are brought into play. It is not said here how the field strength and ohmic resistance thereof is increased, or the extent to which this is done. A way of so doing, however, is disclosed by the diagram and explanation thereof, as in the case of the first step—the same way as there— and the increase is to the maximum, thus yielding the maximum grade of opposition in this motor. It is by shifting the windings of the motor back from parallel to series in the same way in which they had theretofore been shifted from series to parallel. This step is covered by positions 5d and 6, though position 5d would seem to go beyond the step as given in the claim in putting the motors out of relation entirely.

It is thus seen that the method covered by the claim in question is complex. It involves a change in the motor circuit, i. e., from series to parallel, and also in the field circuits, i. e., from parallel to series. In each instance the change is not instantaneous but first to out of relation. The change in the motor circuit has to do with accelerating the speed; whereas, that in the field circuit has to do with preventing the motors being burnt out by the change in the motor circuit. The danger of being burnt out is due to the sudden inrush of current upon the change being made, caused by each motor receiving the entire voltage thereof, and the change in the field circuit prevents such burning out by developing the opposition within the motors to the flow of the current to its maximum at the time the change in the motor circuit is completed. It may be said also that the change in the field circuits has to do with lessening the rate of acceleration due to the change in the motor circuit and making it so that, whilst the motors remain in parallel relation, by changing the field circuits successively from series to parallel relation, the same as was done before the change in the motor circuit, the opposition within the motors may be gradually withdrawn and the rate of speed gradually accelerated.

Claim 6, however, does not expressly disclose that the method covered by it was intended to effect any such ends. In this particular it is unlike the other five method claims, as each of them in characterizing the method covered by it as one of acceleration did so disclose the end intended to be effected by it. Claim 6 characterizes the method covered by it simply as one of "shifting two motors from series to parallel relation." In so doing it is not strictly accurate, for, as we have seen, it covers considerably more than a change in the motor circuit. Strictly speaking, there are but two methods of changing two motors from series to parallel relation. One is instantaneously without any intermediate step, as is done in the Condict patent hereafter referred to. The other is by first putting them out of relation and then in parallel as here. But claim 6, as we have seen, covers more than this, in that it provides for changes in the field circuits; the change in one taking place before the motor circuit is altered and whilst the

motors are still in series and the other simultaneously with the motors attaining the parallel relation. Inasmuch, however, as the latter changes are in order to make the change in the motor circuit effective and to limit its effect, broadly speaking, the method covered by the claim may be said to be one of shifting "two motors from series to parallel relation."

Such, then, is the nature of the method covered by this claim and the ends effected by it. It is to be noted that it is a course of procedure in relation to and within the motor circuit by which the speed is accelerated and the internal resources of the motors are so marshaled as to prevent the inrushing current harming the motors upon their attaining the parallel relation and to limit the increase of acceleration. It has nothing whatever to do with the car circuit outside of the motor circuit. In this particular it is just like the method covered by the purely acceleration claims. It is confined to the motor circuit, and by it also the internal resources of the motors are so marshaled as to provide, in connection with that arising from the change in that circuit, nine distinct rates of speed in an ascending scale. The patentee's mind was concentrated on the motor and field circuits. In the acceleration claims he so handled them as to gradually accelerate the speed from the lowest to the highest rate thereof; and in the sixth claim he so handled them as to accelerate the speed a certain degree and to prevent harm to the motors from so accelerating it.

Claim 6, however, is a subordinate feature of the patent. Nor are any of the acceleration claims in their entirety the main feature thereof. Rather a portion of those claims is the central feature thereof, to wit, so far as they cover the changes in the field circuits both in the series and parallel relation. The patentee thus expresses himself on this subject in the specification:

"I provide switches by the movement of which I may effect gradual acceleration in the speed of the motors by varying in successive steps the field strength and ohmic resistance of one motor without changing that of the other. Having lowered the field strength and ohmic resistance of one motor, I then pass through the same steps with the second motor. Larger changes of speed I obtain by making series multiple changes of the motors as a whole, so that the central feature of my invention is that the smaller changes in speed, both in moving through the series and parallel positions are made by the circuit changes of the field of first one motor and then the other."

That portion of the method of claim 6 which has to do with preventing harm to the motors when they are placed in parallel is not, however, the only way of preventing such harm under this circumstance. The specification of the patent and the diagram of Fig. 2, as heretofore indicated, disclose a method of preventing similar harm to the motors at starting position 1 of the diagram, when, as we have seen, there is no counter-electro-motive force to check the flow of the current. It consists in the use of the rheostat or external resistance, which in addition to the ohmic resistance within the motors is sufficient to prevent harm to them. This method of preventing harm to the motors can be used when they are changed from series to parallel. It differs from the other method in that it amounts to calling in outside help; whereas, that method relies on the motors to protect themselves. And, though there may be no necessity for so doing, it may be used in

connection with the other method of preventing harm, thus affording, as it were, double protection.

It seems clear that the patentee had in mind the use of this method of protection when the motors are changed from series to parallel as well as at starting and considered that, as a rule at least, there would be no necessity to use it when such change was being made in connection with the method of protection disclosed by claim 6, for, in describing position 6 of that claim in the specification, he expressly excluded its use. He said:

"The first multiple position, position 6, in which, without inserting any external resistance, armature AA is connected with the trolley side. * * * Simultaneously the series connection is completed between FFa and FFb. * * * The two motors are now in multiple with each other, and, as this would tend to cause a very sudden acceleration, the field coils of the motors are arranged with their greatest strength so as to increase the counter-electromotive force of the motors; the same arrangement also giving the highest ohmic resistance of each motor."

But it seems equally clear that the patentee also thought that conditions might arise when it would be "desirable and suitable" to use such additional outside protection in connection with that provided by claim 6, though he gave no indication as to what those conditions were. To make this good we will have to take into consideration all that the patentee has said in relation to the use of external resistance, for he refers to it several times in addition to the reference contained in the quotation just made from the specification; and to comprehend his full meaning reference should be had also to the patent issued to G. H. Condict, November 20, 1888, No. 393,323, which undoubtedly Brown must have had in mind when conceiving his invention. It is for an apparatus, to wit, a switch, and not for a method of electric motor control. Condict seems to have been the first to solve the problem of shifting two motors from series to parallel relation in the course of their operation in order to accelerate the speed of rotation of their armatures. He seems not to have conceived the idea of dealing with the motors one at a time when they were in series and again when in parallel; but in both relations he dealt with both motors at the same time, and that in the same manner. Nor does he seem to have conceived the idea of changing the field circuits or the motor circuits from series to parallel mediately, i. e., through an intermediate step, to wit, by first putting them out of relation. He changed each immediately from the one relation to the other. Thus it was that he secured only four different rates of speed by manipulating the field and motor circuits. At starting he had the windings of each motor in series. He then changed them in each immediately from series to parallel. He then changed the motor circuit by changing the two motors immediately from series to parallel, simultaneously therewith changing the field circuits of each motor immediately from parallel to series. And finally he changed the field circuits of each motor; the motors being in parallel, immediately from series to parallel. In connection with each of these four changes he used external resistance. His rheostat was provided with four of such resistances. He used one at starting, two at the next change, and four at each of the other changes, and these resistances he removed gradually one at a time. In so doing he pro-

vided eleven rates of speed in addition to the four already mentioned, assuming them to be those existing when the resistances are all in use as intended, or fifteen in all.  What we have said will be better understood if we insert here the diagram of the method practiced by Condict's switch prepared by appellee's expert.  It is as follows, to wit:

## Condict Patent Connections.

It may be truly said that Condict was wasteful in the use of external resistance, for, as heretofore stated, opposition to flow of current from ohmic resistance differs from that from counter-electromotive force, in that it consumes a portion of the current, turning it

into heat, and the production of current requires the expenditure of money. He seems to have used such resistance for protective purposes and to have cut it out gradually so as not to suddenly change the opposition to the current beyond a given amount, and yet its use in the way in which he used it and its gradual removal had the effect of producing many different rates of speed.

It is in connection with the method of this patent that the further references of Brown to the subject of external resistance now to be quoted are to be considered. In referring to the general object of his invention, he says that it has therefor "an improved method and apparatus for accelerating the motors and regulating the speed thereof in which the motor circuits are utilized so far. as possible to gradate the flow and rate of acceleration, whereby as little as possible of the energy taken from the line shall be dissipated in wasteful external resistances." He does not say that by his method such dissipation is entirely excluded, but only that "as little as possible" thereof shall take place; and he does not limit this little as possible to the use of external resistance at starting, which the diagram shows. Indeed, there is reason to hold that he does not here refer to such use, because such use is not a part of his method. Nor has it connection therewith, as it does not begin until after the starting position is left. Certainly there is nothing here which excludes the use of external resistance in connection with his method, i. e., subsequent to starting, under certain conditions.

Again he says:

"Heretofore the controllers most generally used combine series multiple changes with successive steps in which external resistances are inserted or removed. It has been, however, proposed to employ the circuit changes of the coils of the motors themselves to effect the necessary changes; but such proposed forms have generally been faulty, in that they do not provide sufficiently small graduations of speed, and in that they make changes of the motor circuits which are too complicated and effect too sudden and serious reactions upon the motors. By my improved method, as hereinbefore outlined, I am enabled to obviate this difficulty, as I at no time make too abrupt a change in the motor circuit or one that will do any damage to the motors, and I am able to provide a simple form of apparatus in which a gradual acceleration of the motors is attained by the movement of a single operating lever and by which a number of speed regulations may be gained in which no power is wasted in external resistances."

This would seem to exclude the use of external resistance in connection with his method; but, in the light of a subsequent reference, the meaning can be no more than that it is not to be so used as a rule only and not under every condition.

Again he says:

"R represents an external resistance which I prefer to insert in circuit when the motors are starting from rest."

And in describing that position he says:

"In this position therefore the current passes through blow-out coil B, the artificial resistance R, and the armature and the field of both motors in series; the two windings of each field being also in series. This is shown in position 1 of Fig. 2. I prefer to use the resistance R at the first point, and even might take further resistance steps at this point, as the motors are without any counter-electro-motive force and therefore have only their ohmic resistance to cut down the current flow. This, however, might be dispensed with if desired."

These two statements amount to no more than an expression that the patentee favors the use of such resistance at starting only and might favor more resistance than that provided by the single resistance shown by the diagram at this point. They do not exclude use of resistance at other points under every condition.

Possibly, however, if this were all the patentee had to say on the subject of external resistance, there might be some ground for saying that he thought that under no conditions would external resistance be needed in connection with his invention, and that the only occasion for its being used under any conditions would be at starting; but this is not all he says thereon. He says further:

"It will be seen that without undue complication of parts I am enabled by my improved method and apparatus to gradually accelerate the motors without undue complication of motor circuits and without wasting any substantial current in dead or artificial resistances. However, it is, of course, obvious that I might in connection with my invention also use resistances where conditions make it desirable and suitable."

It is urged that here he has reference to its use in position 1; but that cannot be. He has already expressed himself as to its use there, and said that he not only preferred its use in that position, but that he might take further resistance steps at that time; and the expression is not that he preferred its use then where conditions made it "desirable and suitable." Indeed, there is no indication that its use in that position might be dispensed with under any conditions. Here he is alluding to its use in another connection, where, as a rule at least, it is not needed, but where conditions might make its use "desirable and suitable," and that is as it is expressed "in connection with my invention." Its use in position 1 is not in connection with his invention. His invention has nothing to do with position 1. It has to do with the later positions—those that illustrate the acceleration claims and claim 6. He does not say which position of his invention it might be used in connection with; but the language is broad enough to cover either. In the first sentence of the quotation he speaks of his method being such as to enable him "to gradually accelerate the motors" without the use of such resistance, and it is in this connection, i. e., in connection with the gradual acceleration of the motors, that he says in the last sentence thereof conditions might be such as to make its use "desirable and suitable." Claim 6 is a step in the gradual acceleration of the motors. We think it clear therefore that the patentee contemplated that conditions might be such as to call for the use of external resistance in connection with the method covered by claim 6.

But not only did he contemplate such use of external resistance, i. e., that afforded by the rheostat, in connection with that method, as shown by the specification, he also provided therein for the use of a certain amount of external resistance in connection therewith under all conditions, i. e., that amount afforded by the coil of the blow-out magnet. It is true that it is not provided for protective purposes, but follows only from the use of the blow-out magnet to prevent arc-ing in the controller. Still it is there. It is true also that the resistance so afforded does not amount to much. As stated heretofore, it is claimed by appellant to be so little as to be negligible, and its expert has shown

by calculation how little it is. Yet it is so much that its withdrawal affords an appreciable acceleration in the speed of rotation of the armatures. For, as stated heretofore, the cutting out of the coil in the running positions 5 and 9 when the magnet is not needed for blowing-out purposes is to be accounted for only on the ground that thereby such an acceleration will be caused, and at the same time the current which would otherwise be wasted will be saved.

Has, then, claim 6 been anticipated by either of the patents relied on? This is the vital question in the case, to which all we have been saying leads up, and we believe helpfully so. In the view we take of the case we do not find it necessary to refer to but two of those patents. They are the Wightman patent, No. 444,900, and the Potter patent, No. 524,396. As stated, each is for an apparatus to practice a method of electric motor control and discloses the method which it is adapted to practice. That method is applicable to two motors, each of which is supplied with duplicate windings and involves operation of the two motors first in series and then, after transition from series to parallel, in parallel. The method of the Wightman patent calls, in the process of acceleration, for the treatment of both motors alike simultaneously, both in the series and the parallel relation, and not for their treatment alike in succession, as in the Brown patent; and there is the further difference between it and the Brown patent that the variation of the duplicate windings in order to reduce opposition to the flow of the current and accelerate the speed does not consist in first cutting them out of relation entirely and then putting them in parallel but in cutting them out of relation partially by throwing a shunt around one of them. The different positions in the method are not diagrammed in the patent; but each expert has presented a diagram thereof. Their diagrams differ in the number of positions assigned to the method. That of appellant's expert is confined to the positions described in the specifications of the patent. Appellee's expert adds certain other positions which he thinks are essential to make the method operative. That of the former is as follows, to wit:

Wightman Patent 444900.

That of the latter is as follows, to wit:

Wightman Patent 444900.

It will be seen that the positions so added are b′, c′, d′, f′. It is agreed by both experts that the process of transition or shifting from series to parallel relation begins after position c is left and ends with position f, though, as heretofore noted, strictly speaking, shifting cannot be said to begin until some change is made from the series relation. The word "shifting" in claim 6 has a broader meaning and includes the step taken whilst the motors are still in series immediately preceding the making of the change. So, here, it is used to cover the step or steps taken whilst the motors are in series immediately preceding the change and preparatory thereto. As we are concerned only with the shifting or transition process, it is not necessary to refer to any other positions than those from position c to and including position f. BB′ represent the armature and field coils of one motor, and A′A the field coils and armature of the other motor. G represents the rheostat

or external resistance. It will be noted that it is in circuit at starting and is then cut out of circuit and so left through all the other positions. In this particular there can be no question that Brown follows Wightman. In position c the minimum grade of opposition exists, and the armatures of the motors are at their maximum rotation with the motors in series, for one coil of the field of each motor is shunted from the circuit. Confining ourselves first to the diagram of appellant's expert, it must be accepted that Wightman's method is exactly that of the letter of claim 6 of Brown's patent. In position d the field and ohmic resistance of motor A'A, the right-hand motor, are strengthened by the removal of the shunt around one of the field windings thereof, so that they are both in series. There is, however, a difference here between Wightman and Brown. Wightman strengthens by adding the other winding. Brown strengthens by changing the windings from a parallel relation first to out of relation and then to series relation; but, if Brown's first step covers any method of strengthening the field and ohmic resistance, it is anticipated by any method thereof. If, however, it is limited to the method disclosed in the specification of his patent, still it is anticipated by Wightman, though Wightman's method is not the same as his, because it is an equivalent method. The appellant is forced to concede this because appellee's method is that of Wightman and not that of Brown. In view of this, it is not necessary that we commit ourselves to the position that it is an equivalent method, but simply to assume that it is. It is because either Brown's claim covers any method of strengthening or appellee's method is the equivalent of Brown that it can be claimed that appellee infringes Brown. If so, it follows necessarily that Wightman anticipates Brown.

In position e we have the second step of Brown. A shunt is placed around the left-hand motor. Appellant's expert made the point that such is not the case, because that motor is entirely out of circuit; but its counsel does not so contend, and we need not be detained here. Then in position f we have the third step of Brown. The shunted motor—the left-hand one—is placed with its field strength and ohmic resistance increased in parallel with the other motor.

So we think there can be no question that if we confine ourselves to the mere letter of Brown's claim, and go not a step beyond it, Wightman anticipated Brown. He has the same three steps, and no more, and that in Brown's order. But we do not consider that that attitude of caution which should be taken towards a paper patent requires us to be scribistic. If Wightman's method is not within the spirit of Brown's claim, it does not anticipate, and we understand the real nature of appellant's position as to this Wightman patent to be that his method is not within the real nature and meaning of Brown's claim. The basis of this position lies in the fact that, simultaneously with strengthening the field and ohmic resistance of the right-hand motor, Wightman, in position d, renders inactive, or, as it is called, "kills," the left-hand motor, and when he shunts it in position e it is in that condition. This is indicated in the diagram of appellant's expert by filling in solidly the armature of that motor. This is so because the windings thereof are out of circuit and shunted. This motor is inactive in that it is not the source of magnetic action. As its

armature winding is in circuit, of course, it furnishes internal ohmic resistance to that extent. There is room to contend that the real intent and meaning of Brown's claim is that, when the field and ohmic resistance of one motor are strengthened and a shunt is thrown around the other, the latter motor shall be active. It is so shown in Brown's diagram. If such is the case, then it would seem that it should be held that Wightman's method is not that of Brown, and hence does not anticipate; but, as the case does not hang on this Wightman patent, we do not find it necessary to determine whether this is so or its effect, if so, or whether the meaning of claim 6 is as contended. None of these matters are affected if Wightman's method is accepted to be as shown in the diagram of appellee's expert. As we view that diagram, in which, however, we may be mistaken, it is more favorable to appellee than that of its expert. It shows that in position c Wightman, before taking the first step of Brown, conceding position d to be his first step, killed the left-hand motor and rendered it inactive, so that it is possible to say that Wightman's method consists of four steps and Brown's of only three, and one who effects a thing by more steps than another does not affect it in the same way in which such other does.

Then, as to the Potter patent: We think that it is clear that it anticipates the sixth claim of the Brown patent. The apparatus covered by it is adapted to practice two methods which are slightly different. There may be some question as to whether that shown by Fig. 18 of the drawings accompanying the specification is an anticipation. It is that shown by Fig. 2 which we think anticipates. It is as follows, to wit:

FIG. 2.

The method shown by that diagram is like those of the Condict and Wightman patents which we have considered, in that in the process of acceleration, other than where the change of the motors from series to parallel is involved, it treats both motors alike simultaneously, and not successively, as Brown does. It is also like the Wightman method, in that it affects the ohmic resistance and counter-electro-motive force of the motors by shunting or short-circuiting a portion of the field windings and removing the shunt or short circuit, and not by putting the windings out of relation and then in parallel and out of relation again and then in series, as Brown does. It is like Condict, Wightman, and Brown, in that it makes use of rheostatic external resistance at starting, but unlike them in that here it removes that resistance gradually, so as to get two rates of speed, shown by positions 2 and 3. It is unlike Wightman and like Condict, in that it makes use of such resistance as a protection during the shifting of the motors from series to parallel, though it does not make such an extravagant use thereof as Condict does; only half

of that used at starting being put in circuit. It differs from Brown in the matter of such resistance, in that it makes use of such portion thereof during the shifting process under all conditions; whereas, Brown, as a rule, does not then use it, using it only where conditions make its use "desirable and suitable." And yet they are alike, in that they both use external resistance during that process, Potter that from the rheostat, and Brown that from the coil of the blow-out magnet. When we come to the shifting process itself—that which is covered by claim 6 of the Brown patent—we find it disclosed as it exists in the Brown patent. At position 4 the ohmic resistance and counter-electro-motive force of the two motors are at their lowest, and with position 5 the preparation for the shifting begins; the motors being still in series. The ohmic resistance and field strength of motor No. 1 are increased. This is the first or preparatory step of claim 6 disclosed by positions 5a and 5b of Brown's patent. It is true that here, as in case of Wightman, the increase is secured by removing the shunt around a portion of the field winding of that motor, and not by changing those windings from parallel relation first to out of relation and then to series, as Brown does; but, as said when dealing with the Wightman patent, either claim 6 covers any method of increasing the field strength and ohmic resistance, and hence is anticipated by any method of so doing, or, if it is limited to the method disclosed in Brown's diagram and the descriptive part of his specification, appellant is forced to concede that the method of Potter is the equivalent thereof in order to make out infringement, because appellee uses the method of Potter and not that of Brown. Either Potter anticipates or appellee does not infringe. With position 6 the shifting process actually begins. This consists in placing a shunt around motor No. 2, which is the second step of Brown's sixth claim and position 5c of his diagram. Position 7 is exactly the same as Brown's position 5d. With position 8 the shifting process is completed by placing the shunted motor with its field strength and ohmic resistance increased in parallel with motor No. 1, which is the third and last step of that claim and the same as position 6 of that diagram.

In the first step, when the field strength and ohmic resistance of motor No. 1 are increased, motor No. 2 remains active and so continues to be when shunted by the second step, as is the case with Brown.

There can be no question, then, that Potter has the identical three steps that Brown has, and that in the same order. He first strengthens the field and ohmic resistance of one motor, then shunts the other motor, and then places that motor with its field strength and ohmic resistance increased in parallel with the first motor; and, when he is dealing with that motor and shunts the other motor, the latter motor is active.

The only difference between him and Brown is that he increases the field strength and ohmic resistance of each motor in its order in a different way from Brown; but that way is the same as that used by appellee, so that appellant, to maintain infringement, is bound to concede that it is an equivalent way.

The ground upon which appellant claims that, notwithstanding this, Potter does not anticipate Brown, is that, in connection with this manipulation of the motor circuit as a whole and of the field circuits, Potter uses in the car circuit outside of the motor circuit rheostatic external resistance as additional protection to the motors whilst the motor circuit is being so changed and upon the completion of the change, and Brown does not. In the language of its counsel, Brown discovered "that it was possible to dispense with all external resistance in passing from series to multiple and to rely only upon the internal protection of the motor circuits."

This advance of Brown, it urges, was not obvious to one skilled in the art and possessed utility. That it was not obvious to such an one, it maintains, is made out by the fact that no one before Brown attained to it, and in support of this position the case of Star Brass Works v. General Electric Co., 111 Fed. 398, 49 C. C. A. 409, is cited.

That it possessed utility, it contends, is made out by the fact that appellee uses it, and in support of this position it cites the cases of Lamb Knit Goods Co. v. Lamb Glove & Mitten Co., 120 Fed. 267, 56 C. C. A. 547; Canda v. Michigan Malleable Iron Co., 124 Fed. 486, 493, 61 C. C. A. 194; Dunn Mfg. Co. v. Standard Computing Scale Co. (C. C. A.) 163 Fed. 521; Dubois v. Kirk, 158 U. S. 60, 15 Sup. Ct. 729, 39 L. Ed. 895.

But it does not rely solely on such evidence of utility. By its expert it has proven that the current wasted by the use of the rheostat in such a case represents $26\frac{2}{3}$ horse power, and, in reply to appellee's suggestion that such waste is for only a second, it says that this is so hundreds, if not thousands, of times a day—as often as the motorman finds occasion to shift the motors from series to parallel.

We do not find it necessary to deal with each one of these several positions; but, in passing, we would say this as to the matter of the utility of the advance. In order to determine whether Brown, without rheostatic external resistance, but with the external resistance of the blow-out magnet coil, is more useful than Potter, with rheostatic external resistance, i. e., wastes less current during and upon the change of the motors from series to parallel, it has to be known which involves the use of the most ohmic resistance altogether, i. e., whether Brown's external resistance plus his internal resistance exceeds that of Potter plus his internal resistance, for, so far as the waste of current from ohmic resistance is concerned, it is immaterial whether it is external or internal; and it is possible that appellee's internal ohmic resistance is considerably less than that of Brown plus his external resistance, so that appellee's usage may not be a witness to the utility of Brown. The record may make a disclosure on this subject; but, if so, we have been unable to find it.

It is sufficient to say that we do not think appellant's response to the defense of anticipation is sufficient. The discovery of Brown relied on was a mere idea, and ideas are not the subject of a patent. As said by Judge Lurton in Goshen Sweeper Co. v. Bissell Carpet Sweeper Co., 72 Fed. 67, 75, 19 C. C. A. 13, 21:

"Patents cover the means employed to effect results. Neither an idea nor a function nor any other abstraction is patentable."

Nor did Brown attempt to secure a patent on that idea. What he patented was simply a process of changing a motor circuit from series to parallel to increase speed and at the same time changing the field circuits of the motors to prevent harm to the motors during the other change and upon the completion thereof. He patented a thing; that thing was a process or method; the process or method was these changes in the motor and field circuits in the manner called for in the claim; and the result which he secured was acceleration of speed and protection from harm. If this identical thing or its equivalent is found in Potter, the latter anticipates Brown, and Brown's patent is void. This thing is found in Potter identically as in Brown, except as to the changes in the field circuits, and here the changes are what we are authorized to assume are the equivalent of the changes in Brown. The fact that Potter, in connection with this thing, uses external resistance as an additional protection, and Brown omits it, does not affect to any extent the identity of the two things. Brown's thing is that of Potter. The fact that he omits what Potter uses in connection with it does not make his thing a different and a new thing. It is the same old thing accomplishing the same result in the same way that it does in Potter. This is not to be likened to the case of a combination formed out of less than all the elements of a larger combination securing the same result as that combination, in which case the lessor combination is a different thing from the larger and hence patentable. Here Potter's external procedure and internal procedure did not constitute a combination effecting a certain result. They were two separate things used in conjunction, or rather at the same time; each effecting a separate result. The internal procedure effected an increase in speed and protection from harm; whereas, the external procedure effected simply protection from harm. And, so far as protection from harm is concerned, the two did not combine to secure such protection. Each separately yielded such protection, and that not exactly in the same way, as the internal procedure yielded counter-electro-motive force, as well as ohmic resistance, whilst the external procedure yielded the latter alone.

Brown, himself, recognized that the external procedure and internal procedure were two separate and distinct things, and that their use together did not create a new thing in which the two lost their identity in a larger thing when he referred to the fact that external resistance might be used in connection with his invention where conditions made it "desirable and suitable." Had Brown preceded Potter, there would seem to be no question but that Potter would infringe upon Brown. If so, then it follows, according to the well-recognized principle, Potter anticipates Brown. On the ground therefore that Brown is anticipated by Potter, we feel constrained to hold that Brown is void.

It should be noted that it appears from the record that neither Wightman nor the Potter patent was cited to the examiner in the Patent Office and were overlooked by him. This circumstance affects the presumption in favor of the validity of the patent from its issuance.

Cleveland Foundry Co. v. Kauffman (C. C.) 126 Fed. 658; American Soda Fountain Co. v. Sample, 130 Fed. 145, 64 C. C. A. 497.

The decree of the lower court is affirmed.