## GENERAL ELECTRIC CO. v. ALLIS-CHALMERS CO.

### (District Court, D. New Jersey. July 30, 1912.)

1. PATENTS (§ 165*)—LIMITATION—DESCRIPTION OF INVENTION.

Under Rev. St. § 4888 (U. S. Comp. St. 1901, p. 3383), which requires an applicant for a patent to particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery, the claim is the measure of the patentee's monopoly, and he is entitled only to that which he particularly points out and distinctly claims.

[Ed. Note.—For other cases, see Patents. Cent. Dig. § 241; Dec. Dig. § 165.*]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—SYSTEM OF ELECTRICAL DISTRIBUTION.

The Steinmetz patent, No. 559,913, for an alternating current system of electrical distribution, claim 2, which relates to a three-wire, three-phase system having a fourth or equalizing wire, construed, and *held* not infringed.

In Equity. Suit by the General Electric Company against the Allis-Chalmers Company for infringement of letters patent No. 559,913, for an alternating current system of electrical distribution granted to Charles P. Steinmetz May 12, 1896. On final hearing. Decree for defendant.

Kerr, Page, Cooper & Hayward, for complainant.
Edwards, Sager & Wooster, for defendant.

RELLSTAB, District Judge. The bill is in the usual form for injunction and accounting. It charges the defendant with contributory infringement of the patent in suit by reason of its manufacture and sale to the United States government of apparatus embodying the improvement of said patent, which were installed at Minodoka, Idaho, in what is known as the "Minodoka Project of the United States Reclamation Service."

The defenses are, first, invalidity by reason of lack of novelty; second, noninfringement.

In the specifications Steinmetz describes the object of his invention as follows:

"My invention relates to the distribution of alternating currents, particularly to polyphase distributions. It has its most important application to three-phase systems, but others are not excluded. It has for its object to provide a means of equalizing the voltages upon the several sides of the system, or of 'balancing the lines,' as it is often called.

"It has been proposed to connect transformers wound for three-phase work with the Y system of connection, and to run a neutral wire from the common junction of the coils back to the generator. Where the secondaries are also connected with the Y system, this neutral wire on the primary side is a necessity, because, although a neutral may also be run from the secondary side, this will not equalize the load, but with an unequal distribution of load the three secondary voltages will become unbalanced and greatly unequal. Nothing holds them at an equality, but, on the contrary, they change and adjust themselves so as to be proportioned to the three secondary

currents. The neutralizing wire on the primary side running from the generator to the transformer must necessarily be of sufficient cross-section to equalize the load, and still it is normally an idle wire. This is, of course, objectionable, and deprives the three-phase system, when so installed, of one of its characteristic advantages, to wit, economy in copper cost. The generator also must be specially constructed where this is done, inasmuch as an additional sliding contact must be provided for the neutral wire.

"To obviate the difficulties thus pointed out, I have devised my invention, which consists in winding the primaries of the transformers with delta connection and the secondaries with Y connection and using a neutral or equalizing wire on the secondary side of the system only, and I have found that by this arrangement so long as the primary voltages are constant the secondary potentials also are constant, irrespective of the balance of load upon the secondaries. * * *

"I thus not only obtain the advantage in transmission of current at long distance of confining the equalizing wire to the secondary distribution only, but, inasmuch as this may be connected to fixed terminals upon the motors, I avoid the additional sliding contacts already referred to."

It will be observed that, while the patent deals with systems wherein alternating currents of electricity are generated, transmitted, and distributed for use, it involves the distribution of such currents only in what is called the three-phase system. It deals specifically with transformer connections between the generator and the distribution circuit, in combination with the use of a fourth wire in such distribution circuit, in three-phase systems wherein the problem is how the transformer shall be connected in system so as to obtain the best results in the distribution of energy and avoid the troubles due to overloading one or more of the three-phases.

The improvement is purposed to produce a three-phase system which shall permit unequal loads in the distribution circuit having four wires, without the attendant unbalancing of voltages in the system.

Only a brief description of such system and the devices used therein is necessary for present purposes, which is as follows: The transformer consists of an iron core, a coil of wire wound around the core, called the "primary," which receives the electrical energy to be transformed, and a second coil of wire also wound around such core, called the "secondary," which delivers the transformed energy. This transformed energy may be delivered in any desired voltage; the difference in voltage depending upon the relative convolutions of the primary and secondary coils. In the earlier days the generator delivered current directly to the transformer in the immediate neighborhood of the consumption or translating devices, but in case of long distance transmission, as greater economy resulted by transmitting a higher voltage than it is practical to produce by a mechanical generator, transformers called "step up transformers" are introduced near the generator whereby the low voltage currents developed by such generator are converted into currents of high voltage for transmission, which are reconverted into low voltage suitable for the operation of such consumption or translating devices, by other transformers called "step down transformers" located in the vicinity of such devices.

Many alternating current systems involve only a single pair of supply wires, and are known as single-phase systems. Others utilize more than one current, and are known as polyphase systems. The three-phase system uses three transmission wires in which exist three phases of currents. These currents, however, do not attain their maximum value synchronously, but are displaced, or out of phase, so that their maximum values are successively attained. In the three-phase system, the combining of the three wires avoids the necessity of having two separate wires for each circuit, any one being capable of serving as a conductor for the return current in the other two as long as the load carried—current strength—in each circuit is substantially equal.

In combining these wires, two methods of connection are ordinarily used, known as the "delta" and "star" or "Y" windings. In the delta, the coils are connected end to end, forming a closed circuit, a line conductor leading off from the junctions between each two adjacent coils; while in the star, or Y, three ends of the coils are connected to a common point, the opposite or outer ends being connected respectively to the line conductors. The form of the Y connections permitted the use of an additional wire running from the common point referred to. The equalizing of the loads, however, is not always commercially feasible or desirable, and when the demand upon one circuit is greater than upon the others, and an inequality in current strength ensues, the whole system is likely to be upset, unless some special means are used to correct it. This upset is due to the going down of the voltage in the circuit carrying the greater load with a corresponding increase in the voltage in the other circuits, causing a choke effect in that primary or those primaries of the transformer which have the lesser demand for current made upon them, due to the law governing the action of the transformer; for, adopting the summary of Expert Thomas' testimony set forth in complainant's brief—

"the most salient characteristic of the transformer is that current cannot flow in one of its windings unless there is also a flow of current in corresponding quantity in its other winding. Current cannot flow in the primary, for example, unless a corresponding current is flowing in the secondary; nor can current flow in the secondary as for feeding an electric lamp, unless there is also a corresponding flow of current in the primary. Assume, for example, that the secondary circuit is open so that no current flows therein—that is, that no use is being made of the transformer—then no current will flow in the primary except a certain small amount which serves to magnetize the core, because of the existence of a reactive effect known as self-induction which sets up a counter electromotive force or voltage in opposition to that which is impressed upon the circuit through the primary from the generator or other source.

"Suppose, however, that an electric lamp be connected to the secondary circuit, drawing current therefrom. Then a corresponding current must flow through the primary. Thus the primary current withdraws energy from the generator in exact proportion to the energy delivered to the lamp in the secondary. Of course, it will be readily understood that the presence of a current in the primary of a transformer is essential to the existence of a current in the secondary, as the latter results from the inductive action of the former."

Mr. Thomas, in testifying in this behalf, referred to a sketch here reproduced,

Thomas Fig. 1.

concerning which he said:

"In this figure, $G$ represents the generator supplying three single-phase currents to the wires $a$, $b$, $c$, connected to the primary coils of a transformer with a Y winding. The secondary coils of the transformer are shown as connected in delta and supplying three single-phase currents to the wires $d$, $e$, $f$. It will be understood that the primary coils $1$, $2$, $3$ are properly associated in intimate inductive relation with the secondary coils designated by corresponding numerals. * * *

"Assuming that the lamp $L$ is connected across the circuit $d$, $e$, a corresponding amount of current for operating this lamp should flow through the circuit including it, the wires $d$, $e$, and the secondary coil $3$ of the transformer. But this coil cannot supply such current and have its voltage maintained, for the reason that, if current flows in this secondary winding $3$, current must also flow in the corresponding primary winding $3$. But, while current can pass from the generator $G$ through the wire $c$ to the primary $3$, it cannot return to the generator to complete its circuit, without traversing one or both of the primary windings $1$ and $2$. But these primary windings $1$ and $2$ cannot carry current because their corresponding secondaries $1$ and $2$ are not carrying current, for the reason that under the assumption of the case no lamps or other means of utilizing current are connected to the line wires $d$, $f$, and $e$, $f$, with which said coils are connected. The result is that the voltage of the primary coil $3$ is no longer maintained, and that of the secondary coil $3$ must correspond with the primary. In short, the current which should reach the primary coil $3$ in order to support the flow of current in its secondary winding $3$ meets an obstruction in the other primary windings which it must traverse in order to complete its circuit to the generator. It is evident, however, that if an equal number of lamps be placed upon the circuits $d$, $f$, and $e$, $f$, then equal currents will be required in the secondaries $1$, $2$, and $3$, and consequently the primaries $1$, $2$, and $3$, and the blocking effect of the unbalanced condition will be eliminated."

It was this practical requirement of unequal quantities of current in the several distribution circuits that presented the general problem dealt with in the Steinmetz patent; the particular problem being the one that arose when a fourth wire was introduced in the distribution circuits connected to the neutral point of the Y connected secondaries. The system of connection to be improved by the patent in suit as pointed out by it was the one that connected the primaries of the three-phase transformers in Y and ran a neutral wire from the common junction of such connection back to the

generator. The change contemplated by such patent was to wind the primary of the transformer in delta instead of Y, and to run the neutral wire from the common junction of the Y connected secondary, instead of between the Y connected primary transformer and the generator.

Claim 2 alone is involved, which is as follows:

"2. A generator of three-phase currents, lines leading therefrom, a transformer having its primary connected in delta between the lines, a secondary for the transformer having the coils connected in Y, and an equalizing wire extending from the common junction of the secondary coils."

All these elements are admittedly old. The complainant, however, contends that the combination disclosed and claimed and the results obtained are new.

This precise combination is not shown in the cited prior art. This conclusion, however, does not dispose of the question of novelty, as the art prior to the advent of the patent in suit taught that the several elements used by Steinmetz will perform the functions which he utilized in his system. Is the Steinmetz arrangement and combination of these old elements anything more than mere mechanical selection; that is, such adaptation and readjustment as would occur to an ordinarily skilled mechanic having the knowledge taught by this particular art, and seeking to correct the unbalancing likely to take place in using a fourth wire in the distributing circuit of a three-phase system?

Wenstrom's British patent No. 5,423 of the year 1890 shows delta or Y windings of generators, transformers, and motors in a three-phase system; also, that current may be used directly from the generator or stepped up one or more times by transformers before it reaches the place of utilization. It also teaches the use of a fourth conductor or neutral or equalizing wire connected to the neutral points in the generators, transformers, or motors in which the currents are generated or utilized.

In the Lauffen Frankfort system described in the issue of the London Electrician of September 18, 1891, the voltage was stepped up and down by transformers, in both of which the primary and secondary windings were connected in Y. In Dr. Duncan's (defendant's expert) sketch of this system, acquiesced in by complainant's expert, the secondary circuit from the step down transformer shows a fourth or neutral wire running parallel with the three line wires, thus constituting a four-wire Y connected distribution circuit. In this system, however, a fourth or neutral wire is shown running from the common junction of the step up transformer back to the generator, a method of carrying back an unequal loading disclaimed by the patent in suit, and furnishing the very condition sought to be changed by the system pointed out in claim 2.

This disclosure also shows that the neutral points of the Y connections of both windings of both step up and step down transformers and those of the generator and motor are all connected to the earth for reasons of safety. A like secondary circuit is shown by E. Hospitalier in the book "Polyphased Alternating Currents," published as early as 1893, wherein the consumption devices are connected in vari-

ous relations to such four wire distribution. If this, as contended by defendant, is a description of the Lauffen Frankfort system, it falls within said disclaimer, and, if not, it fails as a disclosure, as the exhibit does not trace the current back to the generator.

In the system described in the Electrotechnische Zeitschrift, in its issue of May 27, 1892, shown in Dr. Duncan's Fig. 3, reproduced here,

F I G. 3.

while the two step down transformers supplying respectively motor and lamps had their primaries connected in delta and secondaries in Y, with a fourth or neutral wire in the distributing circuit supplying the lamps, extending from the neutral point, between which neutral wire and the other three lines of such circuit the lamps were connected, such neutral being used as the common return conductor, the step up transformer at the generating station had its primaries connected in Y and its secondaries in delta. If this step up transformer were not present, or its delta connections were the equivalent of a generator winding as regards maintaining balanced voltages, a complete anticipation would exist. Its presence cannot be disregarded, however, as regards anticipation, for claim 2 of the patent in suit calls for a generator and lines leading therefrom between which lines the delta primaries of the transformer are connected. This puts complainant's transformer, whose secondaries are connected immediately with the distribution circuit across which the translating or consumption devices are connected, in direct relation with the generator. Nor are such delta connected secondaries of the step up transformer of this Zeitschrift disclosure, the equivalent of the generator, as contended by defendant. The function of transformers is not to generate, but to transform energy. They may raise or lower a voltage al-

ready generated, but it is very clear that they cannot of themselves maintain or support any definite voltage, for, adopting Expert Thomas' testimony in this behalf—

"by the law of the transformer, the voltage of a primary winding must always have the same ratio to the voltage of its secondary winding, for example, if this ratio be established as 100, then, if the primary voltage of the transformer is 10,000, the secondary voltage must be 100. If the primary voltage be raised to 20,000, the secondary voltage will become 200. If the primary voltage drops to 5,000, the secondary voltage will then drop to 50. This is true both of the step up and step down transformers. Again, in any transformer the voltage of the primary winding must be the voltage of the circuit to which it is connected and from which it receives its energy. From this it follows that the voltages of the secondary winding of the step up transformers of Duncan's figure 3 depend directly on the voltages of the corresponding primary windings, which, in turn, is the voltage which the winding receives from the circuit. Thus the voltage of the secondary of the step up transformer of Duncan's figure 3 cannot be determined without tracing back the circuits from the primary windings to the generator and finding what voltage is impressed upon these primaries.  *  *  *

"Consider for a moment that only the right-hand lamp of the three shown in the lighting circuit at the upper right-hand portion of the diagram is connected. Current fed thereto by the lower right-hand secondary winding will require current in its corresponding primary winding, which we may take as the lower right-hand primary, which would require current in the wires b, c. Now the lower right-hand secondary of the step up transformer at the left cannot supply current to these wires, since its corresponding primary winding, which we may take as the lower winding at the left, must be fed through one or both of the other primary windings. These other primary windings have no currents in their respective secondary windings, and thus cannot transmit the necessary current, leading to the same unbalancing that has been found and fully explained in the other circuits with similar conditions of supply."

That the unbalancing of the distributing circuit shown in Duncan figure 3 was but slight and could affect the voltages but slightly does not change the function or operation of the Y connected primary of this step up transformer. The demand of such unequally loaded circuit upon the supply wires would always tend, more or less, to choke the inducing primaries connected in Y, and prevent the unbalancing from being carried back to the generator. That the unequal loading of the circuit was not always serious enough to produce a serious unbalancing of the voltage does not make such Y delta connected transformer the equivalent of the delta Y connected transformer of the patent in suit; nor is the delta connected secondary of the former transformer, the equivalent of the generator.

Moody patent No. 508,898 issued November 14, 1893, and Rice patents Nos. 508,838 issued November 14, 1893, and 516,836, issued March 20, 1894, show a delta Y connected winding of a step up transformer. These, however, do not show or use a fourth wire.

None of these references, except the Lauffen Frankfort system, discloses any means for carrying an unbalanced load back to the generator or indicate that such a problem or function was considered, and in the excepted citation such carrying back was, as already noted, performed by the method disclaimed by the patent in suit.

At the date of the Steinmetz application, therefore, connecting the coils of either the generator or the transformer, or of either

the primary or secondary of the transformers, whether step up or step down, in either delta or Y, or any or all in both delta or Y, was well known, as was the fact that different results followed from employing delta or Y connections. It was also known that, if the unequal loading of the different circuits of the three-wire system were carried back to the generator, the disturbing effect upon the system would be remedied. Accordingly, when the Y delta connected primary of the transformer was used and the current strength was unequal in the distribution circuits, it was customary to run a neutral wire from the common junction of the Y connected coils of the transformer primary to the common junction of the Y connected coils of the generator. It was also known that the introduction of a fourth wire in the distribution circuit by connecting it to the common junction of a Y connected transformer secondary gave the system greater flexibility, such a four-wire system giving not only an additional return for the current under certain conditions, but two sets of voltages for supplying the translating or consumption devices connected therewith one value between the main lines and another, viz., $58/100$ thereof between each of any of such main lines and such fourth wire.

Taking care of an unbalanced load being known in the art, Steinmetz' system, if it be more than merely carrying forward the teachings of the art in that behalf, is, at best, but an improvement, the same elements being used to accomplish the same purpose, but in a different way. Assuming such combination to be invention, it was entitled to only the range of equivalents permitted to secondary invention—a more restricted range than is accorded patents of a primary character. Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U. S. 405, 28 Sup. Ct. 748, 52 L. Ed. 1122.

The specification of the patent in suit is meager in its description of the apparatus which it claims will overcome the objection to the referred to system and of correcting the injurious effects of carrying an unbalanced load; but, read in the light of the prior art, it is apparent that the alleged invention consists, not in using or placing a fourth wire in the distribution circuit, nor in obtaining two different voltages in such circuit by the use of such wire therein, but in connecting such an arranged distribution circuit directly with the generator through a transformer which has its primary windings connected in delta, by which connection and arrangement an unbalancing of voltages through an unequal loading of such four wire distribution circuit is prevented. I say directly connected to the generator, as it is evident from the patentee's own disclosure of the condition which his arrangement is to improve that he contemplated but one transformer between the generator and the translating or consumption devices. He states at the beginning of his description that his "invention relates to the distribution of alternating current, particularly to polyphase distribution." A distinction is here made between distribution and transmission circuits, which was then recognized in the art. Whether a step up transformer was interposed between the genera-

tor and the distribution circuits was a matter of preference, depending principally upon whether the distributing circuit was far removed from the generator. In either case the lines between the generator and the step down transformer were called "transmission lines," as distinguished from those proceeding from the secondaries of the step down transformers, and with which the translating devices were connected. This distinction conforms to the ordinary understanding of the terms and to the disclosed purpose of the patent, for we note that the patentee further on in his description, in pointing out the plan which prior to his invention had been recognized as a means of overcoming the disturbing effect of unequal loading on the distributing circuit, refers to the system as having a primary side and a secondary side, and in which the transformer is connected directly with the generator by running the neutral wire from the common junction of the Y connected coils.

In the mind of Steinmetz the main objection to this method of correcting the unbalancing is the great copper cost incident to the use of this fourth wire between the generator and transformer.

As step up transformers were usually placed near the generator, this objection of depriving "the three-phase system of one of its characteristic advantages, to wit, economy in copper cost," would have but little force if only the cost of the wire between the generator and the nearby step up transformer were referred to. The saving in the cost of copper here intended was not that which resulted from dispensing with such short wire, but that which resulted from dispensing with the longer one that existed when no step up transformer was interposed, and which ran from the generator to the step down transformer. Again, in his disclosure of the method of overcoming such objection, the patentee states that the "neutral or equalizing wire" is to be used "on the secondary side of the system only," and in summarizing the advantages to be derived from his arrangement he says that they are obtained by "confining the equalizing wire to the secondary distribution only," which can only mean, as far as a saving of copper cost is concerned, that the objectionable longer fourth wire is taken out of the transmission side—i. e., between the generator and the transformer—and a shorter fourth wire placed in the distribution side of the system, where the translating or consumption devices are connected. Furthermore, in the claim in suit but one transformer is made an element. That element on its primary side is directly connected to the three wires leading from the generator; and on its secondary side with the four wire circuit. The only combination claimed in claim 2 has one transformer. This combination, read in the light of the description, plus the state of the art into which it entered, presents a complete operating system, viz., means for transmitting electrical energy of one voltage from the generator directly to a transformer, by which such voltage is lowered and distributed directly to the translating or consumption devices. To hold otherwise would not only be contrary to the terms of the claim but to the disclosures of the patent, and would make the

device incomplete. If an intermediary transformer was to be included, it should have been claimed.

[1] The patent law not only requires a full and clear description of the manner of making and using an invention, but also that the part improved or combination should be particularly pointed out and distinctly claimed. R. S. § 4888 [U. S. Comp. St. 1901, p. 3383]. The claim is the measure of the patentee's monopoly. He is not entitled to all that he invented, but only to that which he particularly points out and distinctly claims. Greene v. Buckley, 135 Fed. 520, 68 C. C. A. 70; Harder v. United States, 160 Fed. 463, 87 C. C. A. 447.

It is to be read in the light of his disclosure in the specification and tested and construed by the state of the art. Johnson v. Johnson (C. C.) 190 Fed. 20–22.

With the art before him disclosing, inter alia, a step up transformer, Steinmetz chose to confine his claim to a system excluding such character of transformer and to a particular winding in a step down transformer intermediate to the generator and the utilization circuit containing the fourth or neutral wire. But if this limitation to a single transformer should be disregarded, and such restrictive language be held to embrace a step up transformer on the theory that the art taught the use of such transmission of energy to the distribution or utilization circuit, and that the claim should be construed as having implied reference thereto, the necessary result would still be to confine the fourth wire to the circuit where the energy is to be utilized, for the introduction of such step up transformer simply extends the circuit of transmission, and does not impress upon the lines carrying the higher voltage the character of a distribution circuit. The invention relates to the utilization as distinguished from transmission of currents and the particular connection of the transformer windings which was to combine with the four wire distribution circuit was limited to that transformer which stepped down the impractical high voltage—made high for transmission only—to a voltage capable of immediate utilization.

[2] To include under this claim a step up transformer between the generator and the distribution circuit would be merely to extend the transmission lines, and would in no way permit a placing of the fourth wire in such transmission circuit; so that whether the claim be construed strictly and limited to one transformer to be directly connected with both generator and utilization circuit, as I think it must, or broadly permitting the interposition of a step up transformer between the generator and the step down transformer supplying the current for immediate utilization, before an infringement can be declared, the complained of system, in addition to the use of such a connected transformer, must also use a fourth wire in its distribution or utilization circuit, or so combine its fourth wire with a like connected transformer as to amount to an equivalent.

Turning now to the complained of system (hereinafter called the defendant's system). This comprises a three-phase generator, from which proceeds three wires running to a step up transformer; both

generator and transformer being installed at the power station. This transformer has its primary connected in delta, and its secondary coils in Y. From the free ends of these secondaries run the line wires for a distance of 15 to 20 miles to the center of distribution, where step down transformers are located, of which the primary coils are connected in Y and the secondary coils in delta. From these secondaries proceed three distributing wires supplying current for various purposes. The neutral point of the Y connected coils at both the step up and step down transformers is connected to the earth by a wire, the former at the generating or power station, the latter at the distribution stations.

The similarities in this system and that of the patent in suit are, first, the delta Y connections of the transformer windings, the primaries of which are connected with the generator—a physical similarity; and, second, the ability of carrying an unbalanced load from the distribution circuit back to the generator—a functional similarity. The dissimilarities are, first, the introduction of a step up transformer between the generator and the step down transformers, a long distance high tension system of three wires running between the step up and step down transformers, the use of three instead of four wires on the secondary side of the step down transformer, and the connecting of each of the neutral points of the Y windings of both transformers with separate wires running to ground—physical dissimilarities; second, inability to obtain different voltages in utilizing the current on the secondary side of the step down transformers and safeguarding the entire system by the grounding wires—functional dissimilarities.

Does this system infringe that of the patent in suit? Are the dissimilarities in means and operation substantial, or are they but the equivalents of complainant's?

Steinmetz' system contemplates the four-wire distribution circuit. Its special advantages in giving a set of two voltages has already been referred to. This introduction of the fourth wire, however, according to the testimony of complainant's expert Beam, called to explain the disclosure of the patent in suit (X-Qs 23, 73, 74 and 75), had a tendency to bring about an injurious unbalancing which, however, was corrected by the delta Y windings of the transformer. X-Q. 75 and his answer thereto summarizes his testimony in this behalf, and is as follows:

"X-Q. 75. Do you mean that when motors, lights, transformers, etc., are connected in the distributing circuit of the patent in suit in any arrangement whatever with the conductors $g$, $h$, $i$—that is, some with two of said conductors in different orders, and some with three—that the unbalancing of voltages is prevented? A. I could not assent to that as a general proposition, especially if the fourth wire were present in the system. If the fourth or neutral wire were entirely eliminated, the unbalancing of voltages contemplated by Steinmetz would not be present. As long as the fourth or neutral wire is present, somebody is liable to use it as a conductor, with tendency to produce unbalancing in the system."

In the defendant's system there is no fourth wire in the load carrying circuits; and therefore no provision is required to correct

any injurious effects resulting from the presence of such a wire. Complainant's expert Thomas admits that in the three-wire three-phase system known to the prior art the voltages on the line remained balanced, though the load on the secondary coil was unequal, as appears from the following question and answer:

"X-Q. 28. Now, as I understand you, the art, prior to February 5, 1896, as evidenced by the Moody patent 508,898, Rice patent 508,838, and patent 516,836, and other publications, understood well and knew how to construct and operate a generator of three-phase currents, lines leading therefrom, a transformer having its primary connected in delta between the lines and having its secondary coils connected in Y and arranged to supply low tension voltages by means of three secondary lines for feeding lamps, motors, and the like; and, further, the art understood that in such an arrangement the voltages on the line remained balanced, even though the load on the secondary coils was unequal. Is this correct? A. This is correct, if the question refers to the system shown in the Moody patent altered by the use of a lower voltage in the lines connected to the secondary windings of the transformer $T$, such as may make the supply of lamps and such translating devices practicable."

Assuming, however, as seems to be contended by such expert notwithstanding such admission, that an injurious effect upon the voltages may be had from the unbalancing of the loads on the three wire load carrying currents, and as the connections of the windings of the transformer in combination with the groundings of the neutral points of such connections and the conductivity of the earth in the system complained of, are undoubtedly means of carrying an unbalanced load back to the generator without disturbing the voltage of such system, the question of equivalency arises. The delta Y connected step up transformers and the Y delta connected step down transformers used in such system are shown in the cited Moody and Rice patents, and the grounded connection from the neutral points of such Y connection are shown in the Lauffen Frankfort transmission system. Defendant had a right to use, not only the specific means shown in these systems, but all they taught, and, if the specific combination produced in the complained of system is within the teaching of such references, it is not an infringement. If, however, such system, is not within the teaching of such references, but is new and within the patent in suit, it constitutes infringement.

Assuming that the defendant's system contemplates an unbalancing of the load carried in the distribution circuit, and that the grounding of the wires in such system, in addition to providing safety for the entire system, also operates as a return for the unbalanced load back to the generator and prevented any disturbance of the voltage, how can it be said that this shows such an identity of function and means of performing it with those of the Steinmetz method as to amount to equivalency? The utilization of two sets of voltages is not the object in defendant's system. The correction of any unbalancing due to the use of four wires in any part of its system, or by the presence of a fourth wire in the load carrying circuit, is not sought or accomplished. Avoiding the choke in the windings having the lesser demand made upon them by the loads carried is effected not by connecting neutral points of the Y windings by a neutral wire running from point to

point, and through which the current finds a return outlet, but by using for such purpose the earth in connection with such grounded wires, a well-known means for returning the current. Complainant's contention that the grounding of the neutral points of the high tension lines at the generating and consumption points 15 to 20 miles apart is the equivalent of the Steinmetz equalizing wire in his distribution circuit has no substantial basis.

There is no proof in the record that the defendant's system is intended to carry, or does carry, such unequal loading as might tend to produce any unbalanced voltages. As grounding for safety was admittedly well known before the patent in suit, and as the grounding in the defendant's system is in the long high tension transmission circuit, and serves as a safety device against a breakdown in the system, it will be presumed that such means are for such purpose, until the facts show otherwise. The mere possibility that such grounding can and would under certain conditions of unequal loading also serve to maintain a proper balance of the voltages, or the further possibility of a fourth wire connecting translating devices between one of the main line wires of the high tension transmission circuit and the ground, will not make such grounding the equivalent of the complainant's fourth wire, either as an equalizing wire or the producer of two sets of voltages.

The attempted forcing into the defendant's system of unpurposed and unused functions is no more permissible to constitute infringement than to read undisclosed functions into the teachings of the Moody and Rice patents and the Lauffen and Frankfort system, and Zeitschrift publication, to show lack of novelty in the Steinmetz system. Giving the physical and functional differences between the Steinmetz and defendant's systems their normal purposes, the defendant's system comes within the teaching of the prior art, not that which is novel in the Steinmetz disclosure, and is therefore no infringement. Furthermore, the method of reasoning employed to declare infringement, viz., that the four wire circuit of the defendant's system—between the step up and step down transformers—corresponds to the four-wire circuit of Steinmetz, which is in the distributing circuit leading from the secondaries of the step down transformer, and that the unequal currents or loading on the three-wire distribution circuit of defendant's system is applied from the translating devices connected therein through the step down transformers to such four-wire system, and thence through to the generator by means identical in their mode of operation to those of the patent in suit, if applied to the system shown in the Lauffen and Frankfort transmission system, would make the four-wire circuit between the generator and the step up transformer and the connections intermediary to the four-wire distribution circuit of this system an anticipation of complainant's combination; for, by the Lauffen and Frankfort combination, the unequal currents or loading of the four-wire distribution circuit, corresponding to the like circuit of Steinmetz, is applied from the translating devices connected therewith through the step down and step up transformers and their connection back to

the generator, and, under the "that which infringes if later will anticipate if earlier" rule, would invalidate the claim in suit as lacking patentable novelty.

Each of these several systems, however, are distinct combinations. If that of the defendant is not anticipated by that of Lauffen and Frankfort, it certainly is not by Steinmetz, as the latter's range of equivalents is more restricted than that of Lauffen and Frankfort; he being at most but an improver.

The cited art does not appear to have engaged the attention of the examiner in the Patent Office on the consideration of the Steinmetz application for the patent in suit; the file wrapper containing no reference thereto. The effect of this is to considerably weaken the presumption of patentable novelty that attends the grant of a patent. Westinghouse Elect. & Mfg. Co. v. Toledo, P. C. & L. Ry. Co., 172 Fed. 371, 97 C. C. A. 69. That the Steinmetz method of "equalizing the voltages upon the several sides of the system" is such an advance on the art as amounts to invention is not free from doubt, but, as I have reached the conclusion that the defendant's system does not infringe the combination of the claim in suit, I find it unnecessary to pass upon the validity of such claim.

The bill is dismissed on the ground of noninfringement.