## KELLOGG SWITCHBOARD & SUPPLY CO.
## v. MICHIGAN BELL TELEPHONE CO.
### et al.
### No. 4460.

District Court, E. D. Michigan, Southern Division.

Nov. 14, 1932.

Williams, Bradbury, McCaleb & Hinkle, of Chicago, Ill., and Arthur M. Smith, of Detroit, Mich. (Lynn A. Williams, Clifford C. Bradbury, and C. W. Ooms, all of Chicago, Ill., of counsel), for plaintiff.

Fish, Richardson & Neave, of New York City, and Stevenson, Butzel, Eaman & Long, of Detroit, Mich. (Merrell E. Clark, William R. Ballard, M. R. McKenney, and Henry R. Ashton, all of New York City, of counsel), for defendants.

TUTTLE, District Judge.

This suit originally involved five patents, one of which, No. 1,594,877, to Currier and others, was dropped before the case was brought on for trial. Another, No. 1,556,761, to Currier and others, was dropped at the time the trial in court opened (but after experts' affidavits for plaintiff and defendants dealing therewith had been filed under order of this court). This leaves now to be dealt with patents No. 1,221,030 to Currier, No. 1,261,492 to Currier and others, and No. 1,283,400 to Currier.

These patents all have to do with the telephone art, and, in particular, with what is known as "straightforward" trunking. In a telephone system, the subscribers' lines terminate in central offices where the desired connections between the lines are completed. If a subscriber served by one office desires connection with a subscriber served by another office, the connection is completed by means of a "trunk" line extending between the offices. Very early in the telephone practice it was found necessary to provide trunk lines for such connections. In setting up such connections, the operator in the first office who answers the incoming call is called an "A" operator, and the operator in the second office who completes the call to the desired subscriber, is called the "B" operator.

There have long been in the art two forms of trunking between manual offices, respectively known as "order-wire" trunking and "straightforward" trunking.

In order-wire trunking there is, between the "A" and "B" operators, a special order-wire circuit in addition to the trunks used for setting up the subscribers' connections, and by pressing an "order-wire key" an "A" operator may put herself immediately into connection with the telephone headset of the "B" operator so that she may pass the order. Upon receiving the order, the "B" operator assigns a particular trunk for use, and both operators thereupon use the assigned trunk for completing the subscriber's connection. The distinguishing features of such trunking are that the trunk to be used is selected by the "B" operator, and that the order for the connection is passed over a special circuit used only for that purpose.

In straightforward trunking no order-wire is used. The "A" operator selects the trunk to be used for the desired connection and passes the order to the "B" operator over that trunk; the latter thereupon using the same trunk to complete the desired connection. In this type of trunking the attention of the "B" operator is secured by the automatic lighting of a lamp, or other signal, adjacent the incoming terminal of the trunk in the "B" office, and sometimes also by automatic connection of the "B" operator's telephone set to the trunk. The characteristics distinguishing straightforward trunking from order-wire trunking are that the trunk is selected by the "A" operator and that the order is passed over the selected trunk.

At about the beginning of the present century, at a time prior to any date important in this controversy, automatic or dial systems began to come into use and constituted a very flourishing branch of the industry which, for a time, took a great deal of the attention of telephone engineers which might otherwise have been devoted to manual systems. In automatic systems, trunking between the offices is broadly of the straightforward type in the sense that the dial impulses, which control the automatic selection of the proper trunks and lines, take effect over the same trunk wires later used in the conversational circuit between subscribers.

Between the two branches of the telephone tree—the automatic on the one hand and the manual on the other—a good deal of grafting was done in both directions. It was after the beginning of the automatic development that work on the "straightforward" trunking began. From about 1902 the manual branch of the tree may be considered as having two branches, represented by straightforward trunking and order-wire trunking.

None of the patents in suit, and for that matter none of those included in the prior art as presented here, is more than a "paper" patent. None of them discloses a structure of a kind which has gone into general commercial use, and none of them accounts for, or explains, the wonderful growth of the telephone system to its present state of commercial perfection. I do not find in the publications, bulletins, circulars, etc., of the defendants, anything which leads me to the conclusion that the great development in telephone practice flowed in any way from any patent here in suit.

In dealing with patents of this kind care must be taken not to enlarge them unduly to cover things not clearly within their scope. Westinghouse Electric & Mfg. Co. v. Toledo, Etc., Co. (C. C. A. 6) 172 F. 371; Toledo Scale Co. v. Barnes Scale Co. (D. C., E. D. Mich., S. D.) 18 F.(2d) 965.

Long before the patents in suit, this art had developed to a point such that wires, batteries, relays, jacks, plugs, cords, trunk lines, etc., were so old and well understood by telephone engineers and mechanics, that they constituted the brick and mortar of the telephone art from which the telephone mason was able to construct equipment for accomplishing various known functions such as busy tests, automatic connection of headsets, etc., at will, in accordance with well-known general principles, and with as little invention as there is when a mason takes his brick and mortar and constructs a building in the form he wants.

The three patents in suit are closely related. The applications for the first two of these patents were filed on the same day, July 27, 1914, and the drawings and descriptive parts of their specifications are the same. They differ only in their statements of invention and their claims. The plaintiff asserts in its bill of particulars that the first invention, which was Currier's alone, was conceived about a year before the invention of the second patent, which is a joint invention of Currier and two associates. The third patent is again for a sole invention of Currier. It contains the complete disclosure of the first two patents, plus an added feature known, in this case, as "barring." This invention is not alleged to have been conceived by Currier until December 21, 1914, about five months after the filing of the applications for the first two patents. The filing date of the third patent is June 11, 1915.

All three of the patents in suit are concerned with "automatic-listening" straightforward trunking; that is, each trunk circuit is so arranged that, under normal conditions when connection is made with it at the "A" end, that is, when it is "seized," not only will there be a lamp lighted adjacent the trunk to notify the "B" operator that a call is incoming on that trunk, but also the "B" operator's telephone set will be connected to the trunk automatically by a relay so that the order may be passed to her by the "A" operator.

Other forms of straightforward trunking are "key-listening" and "jack-listening." Both of these are the same as the "automatic-listening" form in that the seizure of a trunk at the "A" end normally lights a lamp (known as a "guard lamp") at the "B" end

to indicate that a call is incoming on that trunk. They differ from it in that the "B" operator's telephone set is not automatically connected to the trunk at the same time, but as the result of the operation of a key by the "B" operator in response to the lighting of the lamp, or of her act of plugging the trunk into a listening jack in response to the lighting of the lamp.

Both key-listening straightforward trunking and automatic-listening straightforward trunking date back nearly to the beginning of the century. Webster's patent, No. 841,747 (Defendants' Exhibit No. 24), which was applied for in 1902, discloses key-listening straightforward trunking, and the stipulated use of automatic-listening straightforward trunking at Birmingham and Atlanta, to which I shall refer again later, began as early as 1903.

### The First Patent.

The first patent in suit, No. 1,221,030, is now admitted by the plaintiff not to be entitled to credit for straightforward trunking broadly. The defendants construing claims 6 of this patent (the only one relied upon) to be for automatic-listening straightforward trunking broadly, admit infringement, but deny validity. The plaintiff admits that, if the claim be so read, it is invalid, and contends that it should be construed to cover automatic-listening straightforward trunking in which signals or indications of some kind are provided at the "A" ends of the trunks to show the "usability" of the trunk and to insure that the automatic connection will result "with certainty" if the trunk is seized. The "usability" and "certainty" which plaintiff refers to in this connection has to do at most with only about 2 per cent. of the calls put through in actual practice, namely, to cases of "reseizure" of trunks by "A" operators before the "B" operator has withdrawn the trunk plug after a conversation has been finished.

So the first problem is to decide how the claim of this patent is to be interpreted. It reads as follows:

"6. A telephone system comprising telephone lines, a trunk circuit adapted for use in connecting said lines to other telephone lines, a cord circuit for connecting the said first lines with said trunk circuit, an operator's telephone, means for automatically connecting said operator's telephone to the trunk when connection is made with the trunk by the cord when the connection is to be extended to a distant line, and a key for the cord having circuit connections whereby the operator may communicate with the trunk operator to order up the connection to a distant line."

There are at least three things which lead me to the conclusion that the claim means automatic-listening straightforward trunking broadly.

The first is the language of the claim itself. It would not occur to me, merely from a reading of the claim, that it was intending to describe anything but simply automatic-listening straightforward trunking. I find nothing in the words of the claim, nor in the specification of the patent, to indicate otherwise. Second, the history of the patent leads to the same conclusion. The statement of invention of this patent takes pains to distinguish from order-wire trunking, and points out as a feature of the invention an "order-wire key" for the "A" operator's cord, so constructed that, when operated, it will connect the "A" operator to the "B" operator by way of the trunk and one end of the cord, at the same time opening the cord conductors leading back to the calling subscriber so that he cannot hear the passing of the order to the "B" operator. The effect of this "order-wire key" is again referred to on page 4, lines 5 to 18, of the specification. All of the original claims, and all of the present claims, with the exception of claim 6 here relied upon, are limited to a trunking arrangement in which this splitting key is to be used for cutting off the calling subscriber. I do not believe that Currier thought he had invented straightforward trunking broadly, but the indications are clear that he thought he had improved that type of circuit by providing the order-wire or splitting key, which would prevent the subscriber from overhearing confusion or difficulties encountered during the setting up of the connection. It developed later that this was a step in the wrong direction, because experience proved that it is an advantage to have the calling subscriber overhear the order as it is passed to the "B" operator, giving an opportunity for correction of errors when they occur. Claim 6, here relied upon, does not specifically state that the "key" for the cord is a splitting key, as stated in all of the other claims, but does specify that the "B" operator's telephone set is automatically connected to the trunk, a thing found only in one other of the claims, namely, claim 5. Claim 5 was one of the originally presented claims, and was the only one allowed on the first action of the Examiner. Claim 6, inserted by amendment, was evi-

338

dently drafted along the lines of claim 5, with a view to a similar allowance, and either purposely or by an oversight specified the key for the cord without stipulating that it should be a splitting key. There is nothing in the history of the case to suggest at all, that the claim should be read, as the plaintiff desires, to imply signal lamps or other indicating devices for the trunks which would advise the "A" operator as to whether a particular trunk was in a condition at the "B" board to make it immediately usable. Third, I am confirmed in this view of claim 6 by the fact that counsel for plaintiff and plaintiff's expert themselves, regarded this claim as covering automatic-listening straightforward trunking broadly, at a time when the prior art, as illustrated by the early uses in the Bell System, had not been fully developed, and when it was apparently to the advantage of the plaintiff that the claim should be thus broadly read.

To give to the claim the meaning advocated by the plaintiff would require that I do violence to its language. I would have to take the word "when" in line 82, which always in the English language means time, and construe it in such a way as to make it mean certainty. I would have to twist the whole language of the claim by a line of reasoning that I do not think is justified. I would have to construe claim 6 as covering something which Currier never claimed to have invented, and which, as I am convinced, he never thought he had invented. This I cannot do.

It is well settled that the claim of a patent, which "is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is," may not "like a nose of wax * * * be turned and twisted in any direction, by merely referring to the specification, so as to make it include something more than, or something different from, what its words express." White v. Dunbar, 119 U. S. 47, 51, 7 S. Ct. 72, 74, 30 L. Ed. 303. See, also, Great Western Manufacturing Company v. Lowe, 13 F.(2d) 880, where this court had occasion to express itself upon the same point, and Bettendorf Company v. Ohio Steel Foundry Company, 56 F.(2d) 777, 778, and 779 (C. C. A. 6).

So I find that claim 6 of this first Currier patent is a broad claim to automatic-listening straightforward trunking, and is void because of anticipation by the prior public uses in Birmingham, Ala., Atlanta, Ga., and between Kansas City and St. Joseph, the facts with respect to which have been stipulated by plaintiff (Defendants' Exhibits Nos. 39 and 40), and by the article of Friendly and Burns in the Proceedings of the American Institute of Electrical Engineers, and by the patent to Johnson, No. 1,185,331. Each of the prior uses mentioned involved the employment, in regular and successful commercial practice, of straightforward trunking circuits in which the "B" operator's telephone set was automatically connected to the trunk upon its seizure by the "A" operator at the distant end. Similarly, the circuits of the Friendly and Burns article and of the patent to Johnson are straightforward trunking circuits in which the "B" operator's telephone is automatically connected to the trunk when it is seized at the "A" end. The "key," constituting the last element of claim 6, is found in the Johnson patent in the automatic switch for connecting the telegraphone to the cord and trunk; the telegraphone in this case substituting for the "A" operator so far as concerns the recording and repeating to the "B" operator of the number of the desired subscriber.

Accordingly, I hold this claim invalid.

### The Second Patent.

Patent 1,261,492 purports to be the joint invention of Currier and others. As already noted, the disclosure of the drawing and the descriptive part of the specification are the same as in the first patent. The statement of invention, however, is different. It makes it very clear that the inventors believed their main contribution to be an arrangement such that each operator of a multi-office telephone system would do both "A" and "B" operator work. This involved equipping every operator's position with the usual "A" operator "links" or cords for completing local calls and with both incoming and outgoing trunks for completing trunked calls (Specification p. 1, lines 32 to 43). The inventors' theory was that in this way the operators could fill in the time when they were not busy on local calls by acting as "B" operators in completing trunked calls. As an auxiliary to this scheme, the inventors proposed to use busy signals on the outgoing jacks of all trunks so controlled as to enable trunked calls to be routed always to idle operators rather than to busy ones. To this end every out-trunk jack is given a busy lamp which is lighted not only when the trunk itself is busy but also whenever the operator to whom the trunk leads is busy, either in setting up a connection as an "A" operator or in completing a connection trunked to her as a "B" operator (Specification p. 1, lines 43 to 61). Such an

aid in the distribution of trunked calls to idle operators would be of especial value and importance where every operator was doing both "A" and "B" work. With all operators equipped for making "B" connections, it might be expected that an idle one could usually be found if means for distinguishing between busy and idle ones were provided; and, perhaps more important, it was especially desirable that operators who were already busy with "A" work should not be interfered with by having "B" work thrust upon them. The specification of the patent states the advantages of the system as follows (page 5, lines 99 to 117):

" * * * In order that an operator who seeks to extend a call over a trunk to a distant exchange may always know without preliminary testing of an operator in the desired exchange who is idle, and in order to provide a more equal distribution of the trunked connections or extensions, we preferably arrange the busy signals so that when any operator is busy in the act of answering any call, that is a local call at her position or a trunked call, all trunk jacks at their exchange leading to her position are maintained busy. Thus it will be seen that when a call is to be extended from a cord circuit B to a trunk circuit, the operator can tell at a glance which trunks lead to idle operators at the desired exchange. In this way the trunk calls will not pile up on one operator but will be distributed among the idle ones."

And so these inventors used the familiar brick and mortar of relays, lamps, etc., to build a signaling system for diverting trunked calls away from the busy operators of their combined "A" and "B" operator system and toward idle ones.

So far as this record shows, the combined "A" and "B" operator system was a new idea. But it has never gone into commercial use, and the defendants admittedly do not use it. The plaintiff charges infringement of claims 12, 16, and 17 of this patent, upon the theory that they cover the signaling generally without limitation to the combined A–B idea, which, as I have said, is put forward by these patentees as their main contribution to the art.

The defendants use indicating lamps on the out-trunk jacks of about 20 per cent. of their trunks, but, as already stated, not in a system arranged for combined "A" and "B" operation. There are other differences. The plaintiff lights a lamp at the out-trunk jack of each trunk which is itself busy or which leads to a busy "B" operator, leaving the "A" operators to select trunks having dark lamps. The defendants light a lamp at one trunk only in each group, and it indicates a trunk to use, not a busy trunk nor a busy operator. As long as there are idle "B" operators (with idle trunks) in a team, the defendants' lamps are lighted on trunks to them only, but, when all of the "B" operators of the team are busy, the trunk-to-use lamps indicate an idle trunk to each of them just the same as when they are all idle. The defendants' lighted lamp always indicates an idle trunk, but during only about half of the time that it is burning is the operator to whom its trunk leads idle. Obviously defendants' lighted lamp does not correspond to plaintiff's "busy signal." Neither do defendants' lamps when dark constitute "busy signals," for they will ordinarily be about equally divided between busy and idle trunks, and may be associated with either an idle or a busy trunk leading to a busy operator, or with either an idle or a busy trunk leading to an idle operator. Even where lamps are used in defendants' system, they need not be, and never are, installed for all of the trunks leading to any "B" operator's position. From a quarter to a half of the trunks of each operator are not so equipped, the reason having to do with proper load equalization among operators. This works all right in the defendants' system, because there the "B" operators are always protected from intrusion while busy on one call by an absolute barring mechanism effective against all other calls. In plaintiff's system here under consideration, however, no barring mechanism is used, and it is important to the intended functioning of the combined "A" and "B" positions that all trunks incoming to each operator be guarded at their outgoing ends by the lamps to show when she is busy on either her "A" or her "B" work.

All three of the claims now relied upon (and the same is true of claim 11, which was originally relied upon, but during the trial was admitted by the plaintiff not to be infringed) include not only the busy signals and the control circuits for causing them to show when an operator is busy on any of her incoming trunks, but they include also the outgoing trunks and the "link" (cord) circuits at each exchange. If the claims are read upon the combined "A" and "B" operator system shown and described in the patent, there is no difficulty. All of the elements named will co-operate in their turn in controlling the busy signals named in the

claim. If it is attempted to read the claims upon a system like the defendants' where the "A" operators have no incoming trunks and the "B" operators no cords and no outgoing trunks, the cord circuits and the outgoing trunks at one of the exchanges are left hanging on a limb, so to speak, with no possible part in the control of the signals described in the claim.

I therefore find that these claims are claims to a combined "A" and "B" operator system, and accordingly are not infringed by defendants.

Each of these claims also requires (12 expressly and 16 and 17 by implication) that all of the trunks incoming to a given operator be equipped with "busy" signals so controlled as to indicate to other operators when she is busy. I find, therefore, that these claims are not infringed for the further reasons that the defendants do not have anything which may rightly be called a "busy signal" for their trunks, and because the signal lamps which they do have are not put upon all of the trunks of any operator.

Claims 16 and 17 are what were referred to at the trial as "exchange" claims; that is to say, they specify that all of the trunks leading from one "exchange" to another "exchange" are caused to indicate busy whenever a call is extended to the latter exchange. This can be true of the patentees' own system only in those cases where all of the trunks leading from one exchange to the other terminate at one position in the latter, a situation which would exist in actual practice where the offices were small, or where the community of interest between them was small, or in any offices in times of light loads, as at night. Therefore these claims are further limited to such an arrangement. Under these conditions the patentees' signals would warn the combined "A" and "B" operators at the one exchange not to attempt to trunk calls to the other exchange where the single operator at the latter exchange who could handle such calls was busy. Under these circumstances they would hold up such calls, giving attention in the meantime to other "A" or "B" operator work. In the defendants' system, on the other hand, when all trunks leading from one exchange to another are concentrated on a single "B" position at the latter exchange, or, in other words, when a "B" team consists of but a single operator, the trunk lamps do not operate to warn calls away from that operator while she is busy. Those lamps are lighted on idle trunks leading to her position to the same extent and in the same way

irrespective of whether she is busy or idle, and the lighted lamps always invite the "A" operators to plug in. This difference constitutes an additional reason why these claims are not infringed.

Construed as I have construed them above, I find the three claims of this patent which are now relied upon are valid but are not infringed.

If, however, I were to construe the claims of this patent as requested by the plaintiff to cover idle position indicating lamps in a system such as that of the defendants' without the combined "A" and "B" operator positions and the other features to which I have referred above, then I should find the claims anticipated in substance by the German patent 180,773 and by the patent to Johnson, 1,185,331.

The German patent 180,773 shows a "busy" lamp for each outgoing trunk-jack and control circuits for putting the busy signals on all of the idle trunks leading to an operator whenever she is busy; that is, whenever her telephone set is connected to one of her trunks in the process of setting up a connection. The character of the signals and their purpose are the same as in the plaintiff's patent, assuming for the purpose of the present discussion that the latter contemplated the application of these signals to trunks leading to a true "B" position. In each case busyness of the "B" operator is represented, so far as the signal control is concerned, by the period when her telephone set is actually connected to a trunk. The only difference is that in the plaintiff's patent the "B" operator's telephone set is connected automatically, by a relay, when the "A" operator seizes the other end of the trunk, whereas in the German patent it is connected to the trunk by a manual key thrown by the "B" operator in response to a lamp signal adjacent the incoming trunk terminal, which lights automatically when the "A" operator seizes the distant end of the trunk. The throwing of the manual key by the "B" operator, and so the connecting of her telephone set to the trunk, is "in response" to the seizing of the trunk by the "A" operator inasmuch as it is done as a result of, and in answer to, the lighting of the incoming call lamp, which follows automatically the "A" operator's seizure of the trunk. If the "B" operator is idle, this response is very rapid, presumably not as rapid as with an automatic listening relay, but even with the relay there is a time lag, and the difference is at best only one of degree. In the

system of the German patent, all of the advantages claimed for the trunk lamps in the plaintiff's patent are attained, namely, the informing of "A" operators as to which of the "B" operators are idle, and the distributing of calls among the several "B" operators.

The evidence indicates, and I find, that the busy position indicating lamps of this German patent might, if desired, be applied bodily without the exercise of invention to automatic listening straightforward trunking circuits known at the time of the issuance of that patent, such, for example, as the circuits used in Birmingham, Ala., and elsewhere, nor would there be, in my opinion, any difficulty or any invention involved in having the "B" operator of the German patent system listened on to the trunks automatically by a relay instead of by a listening key. Both were well known for this purpose at the time.

In the Johnson patent, 1,185,331, the "B" operator is automatically listened on in response to the seizure of the trunk, and busy indications in the form of electrical potentials are put upon the outgoing terminals of all idle trunks leading to the operator so long as she is busy. In the Johnson patent these potentials are used to prevent switches, which automatically select the trunks for the "A" operators, from connecting with trunks to busy operators, instead of for preventing the "A" operators themselves from connecting with such trunks, but they are just as truly busy indications, and might obviously be used to give the indications to operators, through the conventional audible or click test, as well as to automatic switches.

### The Third Patent.

This brings me to the third and last patent, No. 1,283,400, granted to Currier individually. This third patent shows essentially the same trunking circuit as the second patent, with the same system of signals at the out-trunk jacks for warning originating operators against using trunks to busy operators. To this arrangement it adds a barring mechanism for shutting out a call that may be routed to a busy operator inadvertently, contrary to the signals, or owing to the lag in the coming on of the signals or in the originating operator's response to them. This patent, like the second, emphasizes the combined "A" and "B" operator feature of the arrangement, but not with the insistence of the second patent, and it is not brought into all of the claims. The "B" operator's telephone set is arranged to be automatically connected to the seized trunk by a relay energized as a result of the connec-

tion with the trunk at the "A" end. The patentee's main object appears to have been definitely to protect the "B" operator from having her telephone set automatically connected to a second trunk while she was already connected to, and busy upon, one of them. For accomplishing this purpose, his reliance is primarily upon the warning signals as disclosed in the second patent, to which he adds means for mechanically holding open the circuits of the automatic listening relays of all idle trunks leading to an operator so long as her telephone set is connected to one of her trunks. The purpose and effect of the arrangement is best expressed in the following portion of his specification (page 4, lines 88 to 107):

"* * * The relays LR2 of these idle trunks (i. e. the idle trunks leading to an operator who has become busy) operate closing their alternate contacts 36 to light their associated busy signals BS. Should another operator insert a plug into a trunk jack associated with this busy trunk operator's position, even though the busy signals BS are lighted, the second A-operator will receive no response as the circuits of the relays H are open at contacts 17 of relays TBC. *The second A-operator receiving no response, knows that the trunk operator is busy* setting up a connection *and withdraws the plug from the trunk jack.* It will thus be seen that no two A-operators can connect to the same trunk operator at one time. With this arrangement it will be seen that the calls are not stacked up at one trunk operator's position but are distributed among the idle trunk operators so that all the work is uniformly distributed. * * *" (Emphasis mine.)

The mechanical barring mechanism which the patentee adds to the lights, although sufficient when used as described in the above quotation, that is, as a secondary defense associated with a primary defense consisting of the lights, would be useless, commercially speaking, as a barring means in its own right. This is because it is subject to two misfortunes: First, if two "A" operators plug into different trunks to the same "B" operator at practically the same instant, the chain of relays which constitutes the barring mechanism would not have time to become effective in the interim, and both trunks would be connected to the operator's telephone set. This is relatively unimportant as it seldom happens. The second misfortune is more serious. It occurs when two or more "A" operators plug into trunks leading to a "B" operator at any time during the interval while

she is busy upon another call. In such a case the barring mechanism would hold off all of the calls until the operator had finished with the one upon which she was working, whereupon the whole group of calls would be connected to her telephone set simultaneously and it would be necessary for her to challenge one "A" operator at a time by giving the trunk number upon which she chose to receive the next order. Such a situation is, moreover, a self-aggravating one because when two or more calls are thus brought in simultaneously, all other calls will be held back until she has finished with the two or more previously brought in together, and of course, the longer the waiting time the more likely it is that several other calls will accumulate in the waiting interval. The evidence is, both from actual tests made on commercial trunks in Detroit and from a mathematical computation of the probabilities involved, that, if the Currier barring mechanism were used alone, without the lights, upwards of 30 per cent. of the trunk calls would suffer double connection to the "B" operator's telephone. Any such percentage of double connections, requiring the challenging of the "A" operators by the "B" operators as above described, would make it necessary that the "B" operators have a single uniform practice of challenging in this way on all calls. Such an operating practice would render mechanical barring wholly unnecessary. Indeed the Currier barring mechanism would be worse than useless because it would bunch calls which would otherwise come in somewhat spaced apart, and bring them all in to the "B" operator simultaneously.

The system of the defendants asserted to infringe has a 100 per cent. effective barring mechanism which permits one, and only one, call to be connected to the "B" operator's telephone at a time, quite regardless of how the calls may come in to her position and quite independently of any signal lamps or other defense mechanism. As already stated, defendants use signal lamps on some 20 per cent. of their trunks, but their barring mechanism works just as effectively without them as with them, and, as already indicated, the signal lamps when used do not tell the same story that Currier's signal lamps tell. They are so arranged as definitely to invite calls to busy "B" operators under certain conditions. In fact, so different is the operation of the defendants' signals that, as shown by the evidence, if Currier's barring mechanism were used with the defendants' signal lamps as a first line of defense, in place of the Currier

signal lamps, something like 22 per cent. of the trunk calls would suffer double connections. The defendants' barring mechanism is substantially as shown in the patent to Bascom issued to the defendant American Telephone & Telegraph Company in 1920 upon an application filed in October, 1918.

The plaintiff relies upon claims 6, 7, 24, and 27. Of these claims, 6 and 7 are directed to the barring mechanism alone without the busy indicating lights. These claims I find to be anticipated by the patents to Johnson 1,-185,331 and Martin 1,303,937 and by the German patent 198,179. The patent to Johnson shows an automatic-listening straightforward trunking circuit which has, like the Currier patent, a busy operator relay energized whenever the "B" operator's telephone set is connected to a trunk and which operates to hold open the circuit of the automatic listening relays of all idle trunks leading to this busy operator so long as her telephone set is so connected. The barring mechanism is released and the operator made available for other calls when she inserts the plug of the trunk upon which she is working into the called subscriber's jack. The same remarks apply also to Martin except that he shows but the one operator for whose protection the barring is illustrated. The difference is immaterial, since the circuit is obviously suitable for use on trunks between exchanges. Although Currier even by combining his indicating lamps and barring means still did not prevent a double connection in the event of two practically simultaneous seizures, Martin filled that loophole also, by his lockout mechanism, which in his system made a double connection impossible under any circumstances. Claims 6 and 7 are fully anticipated by the mechanism shown in these patents.

Plaintiff has criticized the use of these prior patents as anticipations because of the fact that they have automatic switches for selecting the idle trunks to the idle "B" operators. But the claims do not distinguish from the disclosures of these patents, and, aside from that, in my opinion, it would require no invention to apply barring mechanism similar to that shown in either Martin or Johnson to a purely manual system in which the operators themselves were required to select the trunks to the idle operators, either by lamp or by audible click testing upon the trunk terminals. It would require less skill to bring such ideas from the automatic art into the older manual systems than to

take ideas from the manual systems and graft them upon the automatic systems.

The German patent 198,179 is a key-listening circuit rather than automatic listening. Calls incoming to the operator in this patent are evidenced only by the lighting of the call lamp opposite the selected trunk at the "B" operator's position. When one call has thus been routed to a given operator, other calls are prevented from coming in on other call lamps at her position, even though the distant ends of the trunks are seized, by a barring mechanism which is effective until the first call has been answered. I do not find any invention in adding an automatic listening relay to work with the automatic lamp-lighting relay of this German patent, especially as both the automatic-listening and key-listening circuits were well known prior to Currier's time.

Claims 24 and 27 specify both the busy signals which Currier uses as his first line of defense for the "B" operators and the barring mechanism which, as shown, and when used as described, is effective to take care of any incoming calls which may leak past the busy signals. Construing these claims to be for the particular type of signals and the type of barring mechanism shown and described in this Currier patent, I find that they are not anticipated by the prior art. But, as so construed, I find also that they are not infringed by the system of the defendants in which the signal lights are of a different character and where the barring mechanism is in itself the complete defense for the busy "B" operator against intrusion by other calls, as has been above indicated. In the light of the prior disclosures which I have discussed in connection with claims 6 and 7, it would be a real misfortune and an injustice if these claims 24 and 27 or any claims of this Currier patent (in which double connections can be prevented only by using the barring mechanism as a second strainer superimposed upon the first strainer consisting of the indicating lamps) were construed to give Currier a monopoly which would prevent the defendant from using a barring arrangement which is wholly independent of indicating signals and which, irrespective of whether such signals are used, makes it absolutely impossible for the "B" operator's head set to be connected to two trunks at one time.

If these claims 24 and 27 were to be construed to cover busy signals broadly, in combination with barring mechanism broadly, so as to embrace, for example, such signals and barring as are used by the defendants, I would have to find the claims anticipated by the patents to Martin and Johnson above mentioned, which have, as already indicated, a barring mechanism, and in which there is also the equivalent of busy signals, as indicated in the discussion of the Johnson patent in connection with second patent in suit. For like reasons they would present nothing patentable over the German patent 198,179, above discussed, in which busy signal lamps are put upon trunks leading to busy operators and are used in connection with the mechanism above mentioned for barring the lighting of incoming call lamps while one call is before the operator for attention.

As to the third patent, therefore, I hold claims 6 and 7 invalid and void for anticipation by the prior art and for lack of utility. Claims 24 and 27 I hold valid, as I have construed them, but not infringed.

I hold for the defendants with respect to all three of the patents now in suit.

In conclusion, I should like to say that there has been in the trial of this case a very evident and gratifying spirit of fairness and effort on the part of all concerned to get at the actual facts. I think I have never heard a case in which the defendants co-operated so fully and generously to that end, and to simplifying the presentation of a most difficult subject, not only by admitting all facts with respect to circuits alleged to infringe, but by the production of clear and accurate simplified diagrams and functional drawings illustrating those circuits and the other circuits involved, both of patents in suit and of alleged anticipations. These have been of the greatest assistance to the court in understanding matters which otherwise would have been most difficult, if not impossible, to grasp. Also I doubt if a better record could be made, from the standpoint of the plaintiff, than has been made in this case. Every contention of the plaintiff has been fully covered by the record, and only counsel with the energy and ability of those representing the plaintiff in this case could make a record like this one.

I consider this opinion to include a statement of the findings of fact and conclusions of law as required by Equity Rule 70½.

A decree may be submitted dismissing the bill in accordance herewith.